**WESTEC SECURITY SERVICES, INC.**

v.

**WESTINGHOUSE ELECTRIC CORPORATION.**

**Civ. A. No. 81–0303.**

United States District Court,
E. D. Pennsylvania.

April 1, 1982.

As Amended May 12, 1982.

John P. O'Dea, Stradley, Ronon, Stevens & Young, Philadelphia, Pa., for plaintiff.

Edward W. Mullinix, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for defendant.

## OPINION

LOUIS H. POLLAK, District Judge.

Westec Security Services, Inc. ("Westec"), the plaintiff in this matter, seeks to enforce a covenant not to compete against defendant Westinghouse Electric Corporation ("Westinghouse"). A bench trial on the merits has been completed, and what follow are my final findings of fact and conclusions of law.

Plaintiff is a corporation organized under California law, and its principal place of business is in that state. Defendant is a corporation organized under Pennsylvania law with its principal place of business in Pennsylvania. The amount in controversy, exclusive of interest and costs, exceeds $10,000., and the diversity jurisdiction of this court, is therefore, properly invoked pursuant to 28 U.S.C. § 1332(a)(1).

For a ten year period from 1969 to 1979, defendant was engaged in the residential security business through its sole ownership of Westinghouse Security Systems, Inc. ("WSSI"). By an agreement dated July 19, 1979, Westinghouse sold to plaintiff, then named Certified Security Services, Inc., all of the stock of WSSI. The agreement contains the following covenant:

COVENANT NOT TO COMPETE. Stockholder [Westinghouse] agrees not to reestablish or reopen any business or trade which provides security systems or services similar to that provided by the business hereby sold, or in any manner to become interested, directly or indirectly, either as owner, partner, joint venturer, agent, stockholder (other than as a passive, nonmanaging investor) or otherwise, in any such business or trade for a term of twenty years from the date hereof or such shorter period that a court of competent jurisdiction, may find to be reasonable in the case of any dispute. Should any court of competent jurisdiction find this covenant to be unreasonable under the laws of such jurisdiction, then any finding of a shorter period of restriction shall apply only to the jurisdiction of such court and shall not serve to amend this Agreement in any other jurisdiction.

This covenant shall not be construed to prohibit, however, Westinghouse from continuing any business which it now conducts which may provide institutional, industrial, or governmental security services or systems. (P–21, p. 30, ¶ 16)

Closing on the agreement of sale took place on August 31, 1979.

Some fifteen months later, in November, 1980, Westinghouse, two wholly owned subsidiaries of Westinghouse, and Teleprompter Corporation ("Teleprompter") entered into a plan of acquisition and merger whereby Teleprompter became, in August, 1981, a wholly owned subsidiary of Westinghouse. Teleprompter's principal business is the operation of cable television franchises throughout the country.

Among the features which Teleprompter has recently begun to offer prospective subscribers to its cable television systems are home security systems and services. These systems would use the Teleprompter system's t.v. cable to link various types of alarm devices—burglary, fire and medical emergency—in subscribers' homes with central monitoring stations.[1] Teleprompter plans to provide subscribers with home security systems and services through a variety of business arrangements. In some instances, it envisions leasing a cable channel to an independent residential security company which would, in turn, offer to sell home security equipment to subscribers, install it in their homes, and provide both maintenance and monitoring services. In other instances, Teleprompter plans to contract with independent companies to carry out some or all of these activities. And in still other cases, Teleprompter may undertake all of these activities itself.

Plaintiff contends that all of these various forms of involvement in the residential security business are barred to Teleprompter under the terms of the Westec-Westinghouse covenant not to compete. Defendant does not contest the covenant's validity as such—it concedes that the covenant was ancillary to the sale of a business—but it argues that the covenant's terms do not embrace any of the activities in the residential security field to which Teleprompter is committed or on which it soon plans to embark. In other words, the parties' dispute has focused upon the nature and scope of the business sold by defendant to plaintiff in 1979 and on whether that business's activities may be said to have been "similar" to those planned by Teleprompter. Therefore, I begin my more detailed recitation of factual findings by turning to WSSI's history.

I.

A.  *The History of Westinghouse Security Systems, Inc.*

Westinghouse established WSSI as a wholly owned subsidiary in 1969, and through it embarked on the business of marketing residential security systems and services. As already noted, residential security systems consist of an array of electronic devices installed in homes and designed to detect burglary, smoke, fire and other emergencies.[2] These devices transmit electronic signals or "data" to a central monitoring station equipped with computers which decode the data. In the event of an emergency, such as a fire, the appropriate "detector" is triggered; it sounds an in-home alarm and also transmits signals alerting personnel at the monitoring station that a fire has occurred at that location. The monitoring personnel in turn summon appropriate aid from local authorities. While the home security systems Teleprompter has begun to offer would link home and monitoring stations through a television cable, WSSI's systems utilized tel-

---

1.  With one exception, Teleprompter, at the time of trial, had not begun actually to provide any such systems or services to subscribers. However, it has committed itself to providing them in many franchise areas in the near future, and has offered to provide them in the scores of franchise applications which it has submitted around the country since 1979. *See infra* at 115–116.

2.  For example, WSSI offered, and Westec now offers, systems which enable home dwellers to summon prompt medical assistance in the event of a medical emergency.

ephone cables for that purpose, as do Westec's systems today.

Throughout its history, WSSI itself manufactured only a small fraction of the parts composing the home security and monitoring systems which it marketed. It purchased the rest from Ascensores Westinghouse, a Westinghouse subsidiary in Puerto Rico, and from other manufacturers—testing and, where necessary, assembling such parts before shipping them to its market outlets. The greater portion of WSSI's management's energies was devoted to an ultimately unsuccessful quest for a profitable way of marketing the firm's products (P–3, P–19).

Initially, WSSI set out to market its residential security systems through franchise operations, and by 1971 it had established twenty-three franchises with twenty-five year franchise agreements. However, in 1971, WSSI management decided to abandon the use of franchises in favor of five-year term distributorships on the one hand, and company-owned retail outlets on the other[3] (P–3, P–19). Both distributors and company-owned outlets sold home security equipment to consumers and also provided installation, maintenance and monitoring services. From its retail outlets WSSI derived revenue from all of these activities, including monthly billings for monitoring by central communication centers. From its distributors WSSI's revenue took the form of equipment sales.

By 1976, WSSI appeared to have settled upon a strategy of "going to market" "through two primary channels"—(1) retail outlets and distributorships, and (2) equipment sales to builders of condominiums and apartment buildings (P–19, P.III–2). WSSI management's scheme grouped its retail outlets and distributorships in a single "channel" because both sold to the same customers, home dwellers, and competed with the same companies (id.).

Finally, in 1977, because its retail outlets were not proving profitable, WSSI decided to sell them. Generally, they were sold to buyers who became WSSI distributors. At this point, defendant's strategy was either (1) to make WSSI's business—conducted chiefly now via its distributor network—profitable by 1979;[4] or (2) to divest itself of WSSI by the end of that year.

Throughout its ten-year history WSSI's marketing strategy emphasized that what the company offered for sale to the consumer was not discrete pieces of equipment, but a residential security "system" embracing all the various services which the system required—installation, maintenance, and monitoring through a central communication center. Indeed, WSSI considered its competitive strength to rest (1) in this "total system" approach; and (2) in the "Westinghouse" name which distinguished its product in the residential security market as the sole system enjoying a widely recognized corporate name and one with a reputation for reliability (P–25, P–26, P–28, P–30).

During the period 1977–79, after the sale of its retail outlets, WSSI continued to advertise and promote its product as a total "system" and array of services, and it continued to urge its distributors to do the same, encouraging them to use liberally the Westinghouse name and "logos." Having sold its retail outlets, WSSI no longer sold directly to consumers, and no longer provided installation, maintenance or monitoring services itself. WSSI's distributors provided these services and derived the revenue they generated. However, WSSI continued to train its distributors and their personnel in selling, installing, repairing and monitoring home security systems (P–6).

B. *The Sale of WSSI to Westec*

In 1978, defendant began an intensive search for potential purchasers of WSSI. In December, 1978, Warren Mathis, WSSI's

---

3. WSSI offered its franchisees the option of converting to distributors or being bought back by WSSI. Plaintiff became a WSSI franchisee in Southern California in 1970 and a distributor for that area in 1971.

4. WSSI management envisaged the possibility of expanding its distributor network to embrace every population center in the country with more than 250,000 people.

president, met with Thomas Kenworthy and Ron Newlin, plaintiff's chairman and president, and told them that Westinghouse had adopted a new corporate strategy—to divest itself of such retail market-oriented business as WSSI—and that if WSSI were not sold by July, 1979, it would be closed (N.T. 1.149–151, N.T. 2.45).

In the spring and summer of 1979, in the wake of an unsuccessful negotiation to sell WSSI to a major German electronics corporation and another unsuccessful contact with a major security and guard corporation (P–23), Westinghouse decided to negotiate for the sale of WSSI to Westco, WSSI's Pittsburgh, Pennsylvania, distributor. Mr. Mathis recommended to his superiors in the Westinghouse hierarchy that WSSI be sold to Westco, predicting good chances of success on Westco's part by virtue of its intimate knowledge of the business (P–24; N.T. 1.95). However, Westco proved unable to finance the purchase, and on July 10, 1979, Mr. Newlin, as president of plaintiff, met in Pittsburgh with Westco and representatives of other WSSI distributors. That meeting endorsed Mr. Newlin's proposal that plaintiff, (then Certified Security Systems, Inc., and now Westec) would negotiate with defendant to purchase WSSI.

On July 11, 1979, Mr. Newlin met with Mr. Mathis. Mr. Mathis brought to that meeting a copy of the agreement of sale which had been negotiated by WSSI with Westco, and which contained the first and third sentences of what became the covenant not to compete at issue here. Newlin told Mathis that plaintiff's primary concern was its ability as a potential purchaser of WSSI to use the Westinghouse name (N.T. 2.48–50).

To resolve that issue Mathis and Newlin met the next day with Tom Coyne, a trademark attorney for Westinghouse. They negotiated what became the Tradename License Agreement between plaintiff and defendant (P–41). In these negotiations Newlin contended that plaintiff needed a combination of a 6–8 year period to use the name Westinghouse security systems and a 10-year period thereafter during which Westec would be protected from competition by Westinghouse. Westinghouse would only agree to allow Westec and its newly-to-be-acquired distributors to use the name "Westinghouse Security Systems" for a one-year period. However, it agreed to a period of five years use of the Westinghouse logos—during which it was understood plaintiff would endeavor to transfer public recognition of "Westinghouse" security systems and services to "Westec" security systems and services. Defendant also offered, and plaintiff accepted, a twenty-year time period with respect to the covenant not to compete (N.T. 2.66–67).

Following the July 11–12, 1979 negotiations, Newlin returned to California, agreeing to return to Pittsburgh before a Westinghouse board of directors meeting on July 20, 1979 by which time Mr. Mathis wanted to present the agreement of sale to the board for its approval. Newlin returned on July 18, 1979, and he and Mathis met with Robert J. Tubbs, counsel for Westinghouse and a Mr. Polston, counsel for plaintiff. Together, they undertook a thorough review of the agreement of sale. The testimony on both sides revealed that the covenant not to compete, paragraph 16 of the final agreement (P–21), was not a point of contention during these final negotiations and did not generate any sustained discussion. Indeed, the first of paragraph 16's three sentences was unchanged from a sentence prepared by the attorney for Westco in the unconsummated Westco-Westinghouse negotiations (N.T. 3.7–8). The Westco attorney had also drafted the covenant's third sentence. He did so in response to an observation by Mr. Mathis that defendant's Baltimore "defense center" had developed a security system for defense or industrial purposes. During the July 18, 1979 negotiations, Mr. Tubbs explained to Mr. Newlin that he wanted to insure that an "exception" for this system and like systems be included in the covenant, and Mr. Newlin

agreed (N.T. 3.12).[5] The only other discussion regarding the covenant which testimony about the July 19, 1979 meeting disclosed was this: Mr. Newlin commented that he thought the covenant was "very fair and very complete," and Mr. Tubbs replied that he was sure that Westinghouse would not get back into the residential security business (N.T. 2.54). The Agreement in its final form was signed on July 19 and approved by defendant's Board of Directors on July 20, 1979. Closing on the Agreement occurred on August 31, 1979.

The Agreement provided for an initial payment on plaintiff's part of $155,000. In addition, the parties, at the closing on August 31, 1979, entered into a Manufactured Products Agreement committing plaintiff to purchase from Ascensores Westinghouse equipment at a total price of $1,312,449.00. Mr. Newlin testified that this figure was understood by the parties to represent an inflated price: $400,000 of the purchase price paid by plaintiff for WSSI was "buried" in this figure.[6]

### C. Westec's Business After the Acquisition

Since acquiring WSSI, plaintiff has conducted an extensive national advertising campaign aimed at transferring consumer identification from Westinghouse to Westec Security Systems (P–31; N.T. 2.72–3). Westec presently has twenty-seven distributors in nineteen states. It has substantially increased its volume of business over that done by WSSI at the time of the sale, and it currently plans to add 100 distributors over the next five years (N.T. 2.74).[7] Finally, Westec has sought to expand and enhance the product line which it inherited, completing the introduction into the market of a new home security system developed and initially introduced by defendant, and investing in the development of other systems (N.T. 2.75–76).

### D. Westinghouse and Teleprompter

I have already noted that in 1980 defendant began negotiations for the acquisition of Teleprompter. These negotiations led to the purchase of all Teleprompter stock by defendant in August, 1981 for about $650 million, and Teleprompter Corporation is now a wholly owned subsidiary of a wholly owned subsidiary of Westinghouse Broadcasting Company—itself a wholly owned subsidiary of defendant. I have also already noted that Teleprompter's chief business is the operation of cable television franchises. Indeed, Teleprompter is the country's largest cable television company. As of January, 1981, it had some 1.36 million subscribers in thirty-two states (P–33; N.T. 1.158).

In November, 1980, a Dr. Drumheller, the former engineering manager of WSSI and a present employee of defendant, informally told Kenworthy and Newlin of Westec about defendant's planned acquisition of Teleprompter, and also noted that, through Teleprompter, defendant would be reentering the home security business (N.T. 1.160). Kenworthy wrote to the chairman of defendant's board of directors calling his attention to the covenant not to compete. Defendant responded by a letter dated December 23, 1980 and signed by a Mr. D. J. Povejsil, a Westinghouse vice-president for corporate planning (P–54). Mr. Povejsil wrote (1) that the issue of whether the

---

**5.** The covenant's second, or middle, sentence, which begins "Should any court ...," was inserted, without disagreement, by Mr. Polston, plaintiff's attorney.

**6.** Defendant presented no evidence to rebut Mr. Newlin's testimony, and defendant's own evidence supports the inference that defendant also regarded the Manufactured Products Agreement as embodying a substantial portion of the consideration defendant received from plaintiff. Mr. Tubbs testified that defendant viewed the $400,000 figure in § 13(d) of the Agreement (P–21, p. 26) (limiting defendant's liability for indemnification purposes) as equivalent to the consideration received by defendant (N.T. 3.17–18). Two hundred forty-five thousand ($245,000) dollars is, therefore, the amount of "buried" purchase price recognized by defendant. It is not necessary for me to resolve whether the proper figure is $400,000. as plaintiff asserts, or $245,000 as defendant apparently believed.

**7.** Becoming a Westec distributor involves a not inconsiderable investment. In a smaller city such as Tucson, Arizona, one must invest at least $150,000. In a larger metropolitan area, like Houston, Texas, one must raise some $400,000 (N.T. 2.74–5).

Teleprompter acquisition would conflict with the provisions of the Westinghouse-Westec agreement was under review; and (2) that "[c]urrently it is my understanding that Teleprompter is not in the residential security business" (P–54).

As of the time of trial, Teleprompter was still not "currently" providing residential security systems or services to its subscribers.[8] However, from January, 1979 to July, 1981, Teleprompter submitted at least sixty-five cable television franchise applications to municipalities throughout the country which included home security systems and services among the various optional features which Teleprompter proposed to offer subscribers if granted the franchise awards (P–34 to P–39). At the time of trial Teleprompter had been awarded fifty-three such franchises, permitting or requiring Teleprompter to offer residential security systems and services to its subscribers in the franchise areas (P–39).[9]

The home security systems and services described in some detail by Teleprompter in its franchise applications are markedly similar to those marketed by WSSI and its distributors at the time of WSSI's sale to plaintiff and to those presently marketed by Westec and its distributors (P–34 to P–39).[10] Indeed, the only significant difference is that plaintiff's systems are linked with monitoring centers via telephone lines, whereas the systems described by Telep-

rompter are to be linked via "interactive," "coaxial," or two-way cable t.v. lines.

Teleprompter plans to provide these home security systems and services to subscribers through one of four different business arrangements:

(1) by leasing a cable t.v. channel to an independent company which would sell home security equipment to Teleprompter subscribers in a given franchise area, install and maintain the equipment in their homes, and operate a monitoring center linked to subscribers' homes by the cable channel leased from Teleprompter;

(2) by offering and selling home security systems and services itself but contracting with other companies to install, maintain, and monitor the systems;

(3) by selling, installing, and maintaining home security equipment itself, but contracting with an independent company to provide monitoring services; or

(4) by establishing its own monitoring center and providing that service in addition to selling, installing, and maintaining home security equipment itself (N.T. 4.20–21).

Teleprompter envisions choosing one of these four scenarios in each franchise area taking account of various factors such as the presence or absence of local home security companies capable of providing the systems and services Teleprompter has offered

---

**8.** With the exception of the "Grosse Point experiment" discussed *infra* at 116.

**9.** Most of these franchise provisions are permissive rather than mandatory. For example, the city ordinance granting Teleprompter a franchise in Groveland, Florida, gives Teleprompter the right to provide "such aspects of Expanded CATV Service [including burglar alarm service] ... as [Teleprompter] may from time to time deem advisable" (P–39: Florida Franchises, 00091). (*See also, e.g.,* P–39: California Franchises 00062, 00096; Illinois Franchises, 00087, 00088; and Minnesota Franchises, 00098). However, some of the franchise awards require that Teleprompter provide home security systems and services by a specified date. (*See, e.g.,* P–39: Michigan Franchises, 00058; Texas Franchises, 00080; and N.T. 5.5).

**10.** For example, Teleprompter's application for a franchise in Philadelphia, Pennsylvania reads, in pertinent part (P–34):

*Burglar, Fire Protection and Medical Alert.* Applicant will offer, on an optional basis, "Cableguard" which is a burglar, fire protection and medical alert service developed by Tocom Industries, Inc. The Cableguard service provides for the installation and maintenance of intrusion detectors on windows and doors, photoelectric fire and smoke sensors, an alarm which will summon aid in case of sickness or accident, and an emergency alert button located next to doors which can be used in the case of forced entry. The system sends the alarm over the cable system's return line. At the head-end a computer constantly monitors the conditions of the sensor devices in subscribers' premises. When an alarm is received the appropriate emergency service will be immediately dispatched.

in its franchise applications and agreements (N.T. 4.21–22). The franchise applications and agreements in evidence suggest that the second scenario is the one which Teleprompter currently favors. The bulk of the applications contemplate installation, maintenance, and monitoring services being provided by companies other than Teleprompter (P–39).

As part of its effort to offer residential security systems and services to its cable t.v. subscribers, and to others, Teleprompter entered into an agreement with Tocom, Inc. U. S. A. ("Tocom") on July 10, 1980 and with Datavision, Inc. ("Datavision") on April 14, 1981 (P–42, P–43). Both Tocom and Datavision market home security systems similar to those offered by Westec since it acquired WSSI. The Tocom agreement grants Teleprompter an option to purchase from Tocom up to 10,000 "Tocom 55 plus units" [11] (P–42). Nothing in the record suggests that Teleprompter has of yet done anything pursuant to that option.

The Datavision agreement also, in large part, consists of a series of options (P–43). One such option grants Teleprompter the right to market Datavision's home security and monitoring system to its own subscribers and to other companies in the cable television industry. The same option also grants Teleprompter the right, on a non-exclusive basis, to market Datavision's home security and monitoring systems to consumers in areas where no television cable has been laid [12] (P–43, § 4.1, p. 20). Like Westec's systems, the Datavision home security systems include interior and exterior intrusion alarms, fire and smoke alarms, "medical alert," and "on and off operation" (P–

43, p. 2). Finally, the Teleprompter-Datavision agreement would permit Teleprompter to market and advertise the Datavision monitoring system under its own descriptive trade name or any other name Teleprompter chose (P–43, § 4.2, pp. 20–21).

The options in the Datavision agreement are not exercisable by Teleprompter until after a "Test Period" prescribed in the agreement is completed (P–43, §§ 2.2, 2.8.1, 3.1, pp. 7, 11–13). During this "Test Period," which is currently under way, Datavision is providing water meter reading services to a handful of Teleprompter's cable television subscribers in Grosse Point, Michigan (N.T. 4.19–4.20). With the exception of this experiment, there is no evidence that either Teleprompter or Datavision has yet done anything pursuant to the Datavision agreement.

## II.

### DISCUSSION AND CONCLUSIONS OF LAW

Plaintiff contends that the covenant not to compete in the Westinghouse-Westec agreement was intended to prevent defendant from engaging in any aspect of the residential security business. It seeks an interpretation of the covenant which would prohibit Teleprompter, as a wholly owned subsidiary of defendant, from carrying out any of its various plans to offer residential security systems and/or services to Teleprompter's cable television subscribers,[13] and it seeks a declaratory judgment and an injunction embodying its interpretation of the covenant.[14]

11. These "units" constitute "two way interactive communications systems" which permit, inter alia, signals produced by alarm devices to be transmitted, over television cable, to monitoring stations.

12. In such areas, the home security systems would be linked to monitoring centers through telephone lines in the same fashion as were the systems marketed by WSSI and as are those marketed by plaintiff.

13. Plaintiff also contends that the covenant prohibits Teleprompter from marketing residential security systems and/or services to per-

sons and companies which are not Teleprompter subscribers.

14. The parties agree that Pennsylvania law applies in this diversity action. A federal court sitting in diversity must apply the choice-of-law principles of the forum state. *Day & Zimmerman v. Challoner*, 423 U.S. 3, 96 S.Ct. 167, 46 L.Ed.2d 3 (1975); *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In contract actions, Pennsylvania courts apply the law of the place where a contract is made and where it is to be performed. *In Re Estate of Danz*, 444 Pa. 411,

Thus, I must determine (1) whether the covenant embraces the activities which plaintiff seeks to enjoin; and (2) if it does embrace any or all of those activities, whether, under Pennsylvania law, the covenant is enforceable—or whether it is void, in whole or part, as a matter of public policy.

## A. *Interpreting the Covenant*

"In construing a contract, a court's paramount consideration is the intent of the parties. If the language of the contract is unambiguous and susceptible of only one interpretation, a court will determine the parties' intentions on the basis of the clear wording of the contract." *O'Farrell v. Steel City Pine Piping Co.*, 266 Pa.Super. 219, 403 A.2d 1319, 1324 (1979) (Citing cases). I have already quoted the full text of the covenant not to compete, *supra*, at 110–111. The parties' dispute over the intended meaning of the covenant focuses on the underscored clause in the covenant's first sentence:

> Stockholder agrees not to reestablish or reopen any business or trade *which provides security systems or services similar to that provided by the business hereby sold...*[15]

Defendant contends that this clause manifests an intention by the parties to limit the restrictive scope of the covenant not to compete to WSSI's business at the time of the sale, which defendant characterizes as "nothing more than the manufacturing and selling of home security equipment to distributors." Memorandum in Support of Defendant's Proposed Findings of Fact and Conclusions of Law at 45. Thus, defendant argues that since WSSI, at the time of the sale, was not selling home security systems directly to the public or installing, servicing or monitoring such systems, the language of the covenant leaves all of these activities open to Westinghouse. Plaintiff contends that the underscored clause manifests an intention to restrain defendant from reentering any of the activities connected with the home security business which WSSI performed in the course of its ten-year life span under Westinghouse ownership. Since these activities included selling home security systems directly to the public and providing installation, maintenance and monitoring services, the covenant, so plaintiff argues, restrains defendant from embarking on any of these aspects of the trade.

Plaintiff also offers what is essentially an alternative interpretation and argument: The phrase "security systems or services" was intended to embrace not merely the hardware WSSI provided to its distributors, but also the "package" of systems and services which WSSI marketed to consumers, up to the time of sale, through its distributors—notwithstanding the fact that the distributorships were not a part of the "busi-

---

283 A.2d 282 (1971); *Formigli Corporation v. Alcar Builders, Inc.*, 329 F.2d 79 (3d Cir. 1974). Here, the contract was made and was to be performed principally in Pennsylvania. Hence, I adopt the parties' view that Pennsylvania's substantive law governs in this matter.

**15.** Defendant does not dispute that Teleprompter's status as a wholly-owned subsidiary of a wholly-owned subsidiary of defendant draws Teleprompter within the potential reach of this clause by virtue of the subsequent language: "or to become interested ... as owner ... in any such business or trade."

Another question of interpretation respecting this clause can also be disposed of in short order: whether any *technological* difference between the security systems or services marketed by WSSI and its distributors at the time of WSSI's sale to plaintiff and the systems or services which Teleprompter plans to market can be construed as rendering the latter *not*

"similar" to the former within the meaning of the covenant. The only technical *difference* between them which the evidence disclosed lay in the obvious fact that the security systems which WSSI marketed, and plaintiff now markets, rely upon telephone lines to connect the buyer's home with a monitoring station, whereas those which Teleprompter plans to market rely upon television cables to perform the same function. Otherwise, as defendant's counsel readily conceded at trial, the systems and services are functionally identical (N.T. 4.45). They offer the same range of alarm and "alert" devices, and the equipment they employ is, in large measure, interchangeable. Defendant's counsel did not press this issue at trial, but to the extent that it is a live issue, I have no hesitation in resolving this particular question in plaintiff's favor. *See Foulke v. Miller*, 381 Pa. 587, 112 A.2d 124 (1955).

ness ... sold" in the sense that plaintiff, as buyer, acquired no ownership interest in them. Since the distributors sold Westinghouse home security systems to the public and provided installation, maintenance and monitoring services, it again follows, according to this interpretation, that the covenant prohibits defendant from undertaking these activities.

In support of its interpretation of the covenant, defendant maintains that the phrase "provided by the business hereby sold" can only be read sensibly and grammatically as an elliptical form of the following clause: "which is provided by the business hereby sold." It cannot be read—in the fashion plaintiff suggests—as making reference to the past. Thus, defendant would have me read the disputed language as though it were written:

> ... any business or trade which provides security systems or services similar to that *which is provided by the business hereby sold*...

No doubt defendant's reading of "provided" is more grammatically sound and more natural than a reading which would interpolate, "which *was*, or *has been*, provided by the business ... sold."

The flaw in defendant's reading of the clause is that defendant's reading has no plausible explanation for what the parties intended by "security systems *or services*" (emphasis added), for defendant contends that at the time of the sale WSSI did nothing more than manufacture and sell home security equipment to distributors and that these activities constitute the full scope of the covenant not to compete.[16] Defendant maintains that by "services" the parties intended merely the *advice* which WSSI offered its distributors regarding "systems, installation, sales promotion and the like." But the phrase reads "*security ... services*," and the more plausible reading would give content to that phrase in the ordinary sense of security services to homeowners.[17]

Plaintiff's first proffered reading is also not free from doubt. While plaintiff's reading of "provided" to embrace WSSI's activities prior to 1979 renders "security ... services" explicable, the phrasing is not the most natural way to refer to past activities. On the other hand, plaintiff's second suggested interpretation of the clause— that the covenant was intended to embrace the activities of WSSI's distributors as well as those of WSSI itself—finds support in the Trade Name License Agreement dated August 31, 1979 and made part of the agreement of sale containing the noncompetition covenant (P–41). There, plaintiff is granted, *inter alia*, an exclusive right to use and to authorize its distributors to use WSSI's trademarks and "*service* marks" in dealings with consumers. One can reasonably infer from the unambiguous scope of the Trade Name License Agreement that the parties intended the clause—"any business or trade *which provides security systems or services similar to that provided by the business hereby sold*..."—to have a similar scope, i.e., that the parties understood this language to embrace not only the providing of "security systems or services"

---

16. *See United Aircraft v. Boreen*, 284 F.Supp. 428, 439–440 and n.10, (E.D.Pa.1968) (a covenant not to compete case employing the rule of construction that a word not plainly inserted in a contract by accident or mistake is not to be discarded "while there is a plain and natural construction which can be given to it, not manifestly destructive of the general intent of the sentence"), quoting *City of Philadelphia v. River Front R., Co.*, 133 Pa. 134, 19 A. 356 (1890). As the learned judge in *Boreen*, supra, explains, the instant rule of construction is *ut res magis valeat quam pereat*. Cf. Note, The South-West Africa Cases: *ut res magis pereat quam valeat*, 115 U.Pa.L.Rev. 1170 (1967).

17. I find my perception that the parties understood "security" to modify "services" as well as "systems" confirmed by the phrase, "institutional, industrial, or governmental *security services* or systems" (emphasis added) which appears in the covenant's third sentence. The only reasonable inference to be drawn from this language is that the parties regarded the ordering of "services" after "systems" in the first sentence—versus "systems" after "services" in the third sentence—as a matter of indifference. That being the case, I am all the more hard-pressed to credit the meaning defendant would ascribe to "services" in the disputed clause.

by WSSI itself but also the providing of "systems or services" by its distributors, who were clearly to become plaintiff's distributors. Only by reading the disputed language in this fashion does the protection from competition afforded by the covenant not to compete correspond in a plausible way to the protection plainly contemplated by the Trade Name License Agreement.

Were it necessary for me to rely solely on the language and structure of the contract itself to interpret the scope of the covenant's language, I would adopt this second of plaintiff's proffered interpretations on that basis. However, inasmuch as the disputed language is not free from ambiguity, and "neither party can rest on a plain meaning approach," *United Airway Corp. v. Boreen, supra* at 439, Pennsylvania law directs me to look also "to extrinsic evidence to determine what the parties meant." *Id.* See also *O'Farrell v. Steel City Pine Piping Co., supra,* 403 A.2d at 1324. ("If the language of the contract is ambiguous ... then the court will adopt the interpretation which, under all the circumstances, ascribes the most reasonable, probable and natural conduct of the parties, bearing in mind the objects manifestly to be accomplished.") (Citing cases); *Foulke v. Miller,* 112 A.2d 124, 127 (Pa.1955). The extrinsic evidence confirms my view that plaintiff's interpretation reflects the meaning which the parties ascribed to the instant covenant.

I find that Mr. Newlin's statements and conduct on plaintiff's behalf in the course of negotiating the agreement of sale with defendant made plain to defendant that a crucial consideration which plaintiff, as buyer, sought to inscribe in the agreement, was protection for Westec and its newly-to-be-adopted distributors from competition by defendant in the consumer market for home security systems and services. And I find that defendant's negotiators acquiesced in plaintiff's understanding that the covenant not to compete, in fact, embodied this consideration.

Mr. Newlin halted negotiations with defendant on July 11, 1979 until defendant's trademark attorney, Tom Coyne, arrived the next day to hammer out a provision granting Westec and its distributors rights to use the defendant's tradename and service marks in the consumer marketplace— in selling security systems to the public and in providing installation, maintenance and monitoring services (N.T. 2.48–2.51; P–41). Mr. Newlin's testimony regarding the parties' negotiations over the respective time periods (1) during which plaintiff would be entitled to use Westinghouse's name and service marks, and (2) during which plaintiff would be protected from competition by Westinghouse, supports the view (1) that the first period, set out in the Trade Name License Agreement, was intended to be one in which Westec and its distributors, through advertising and the use of service marks on trucks, equipment, and so forth, would seek to transfer to "Westec" security systems and services the public image and good will presumably enjoyed by "Westinghouse" security systems and services; and (2) that the second period, set out in the covenant not to compete, was intended to be one in which Westec and its distributors would be free from competition from Westinghouse in purveying Westec security systems and services in that marketplace.

Finally, I find abundant evidence in testimony and exhibits that the phrase "security services" had acquired a firm meaning in the language of WSSI and its distributors, including plaintiff, over the nine years prior to the sale. The phrase connoted the "total system approach" or the "total package" of services which WSSI vaunted to the public and to its own distributors—as the unique feature of its products as against others' wares. Security "services" meant precisely: installation, maintenance and monitoring of home security systems. This evidence reinforces my rejection *supra,* of defendant's proffered reading of "services" in the covenant language to mean advice to distributors, and it also supports my adoption of plaintiff's reading.

Accordingly, I conclude that the parties intended the language, "any business or trade which provides security systems or services similar to that sold," to embrace

any business or trade which (1) sells home security "systems" or equipment to homeowners; (2) sells such equipment and/or equipment for monitoring home security systems to persons or commercial entities other than homeowners; or (3) provides installation, maintenance and/or monitoring services for home security systems.

### B. *Applying the Covenant's Language to Teleprompter's Contemplated Activities*

#### i.

Defendant concedes that the covenant restrains Teleprompter from manufacturing home security equipment and from selling such equipment to retailers or other commercial buyers such as home builders. The interpretation of the covenant which I have adopted makes plain that the covenant also restrains defendant, through Teleprompter, from offering home security systems for sale directly to the public.[18]

This interpretation of the covenant likewise restrains Teleprompter from providing, either by itself or by contract with other companies, installation and/or monitoring services for home security systems.

#### ii.

■ Thus, the covenant, as I have construed it, clearly precludes all the various arrangements for offering home security systems and services which Teleprompter is actively contemplating—save one, that of leasing a cable channel to an independent home security company. Whether the covenant embraces the leasing arrangement is, in my view, a difficult question. Plaintiff contends that were it to enter any such leasing arrangement, defendant would "become interested" in a "business or trade" similar to WSSI's within the covenant's meaning. I find this reading of the covenant's language a strained one. Plaintiff

imports an additional subordinate clause into the covenant, for plaintiff would have me read the covenant to preclude Westinghouse from becoming "interested ... as owner" in a business, i.e., Teleprompter, which, in turn, would "become interested," as lessor, in a business which would provide "security systems or services similar to that provided by the business ... sold." The activities which Teleprompter would undertake were it to adopt any of the other arrangements are all business activities in which WSSI and its distributors engaged at the time of the sale and in which Westec and its distributors currently engage. By contrast, leasing a cable channel is patently something which neither WSSI nor Westec could undertake. Moreover, leasing a property, i.e., a cable channel, to an independent concern does not create a relationship which one ordinarily would describe as becoming "interested" in that concern. The lessor does not possess an "interest" in the lessee which generally one would see as akin to the "owner's," "partner's," "joint venturer's," "agent's," or "stockholder's" "interest" in the concern to which he, she or it is connected.

■ In construing the instant language I am bound by a rule of strict construction. *Hayes v. Altman*, 438 Pa. 451, 266 A.2d 269, 271 (1970); *Morgan's Home Equipment Corp. v. Martucci*, 390 Pa. 618, 136 A.2d 838, 844 (1953). I am likewise bound to give to the restrictive covenant's language, if it is "reasonably possible," that construction "which will preserve the validity of the contract." *Harris Calorific Co. v. Marra*, 345 Pa. 464, 29 A.2d 64 (1942).

■ In Part II.D. of this opinion, I canvass in some detail the case law which governs in determining the validity of restrictive covenants like the one at bar. It is

---

**18.** It does so irrespective of whether the equipment which Teleprompter would sell were to bear Westinghouse or Teleprompter trademarks, or the trademarks of the company or companies which manufactured the equipment. I have already noted that the Teleprompter-Datavision agreement would permit Teleprompter to market and advertise the Datavision monitoring system under its own descriptive trade name or under any other name Teleprompter chose. I also note that defendant has the right to change Teleprompter's name to "Westinghouse" or "Group W," and that undisputed evidence of record reveals that defendant is seriously considering such a change. Stipulation between the parties filed December 4, 1981.

sufficient to note here that two principal factors in such a determination are (a) whether the restraint is reasonably necessary to protect the buyer's interest in the goodwill it has purchased; and (b) whether the buyer's need for protection is outweighed by the hardship enforcement would create for the seller.

Plaintiff argues that preventing Teleprompter from undertaking leasing arrangements is necessary to protect the interest it purchased in Westinghouse security systems' and services' name and reputation. Plaintiff grounds this argument in the notion that potential customers of an independent home security company leasing a Teleprompter/Westinghouse cable channel, an "important component of a security system," would be attracted by the fact that the cable bore the "Westinghouse name." The problem with this notion is that the goodwill which plaintiff purchased attached to Westinghouse security systems and services; it did not inhere in the reputation enjoyed, or suffered, by the enterprise which owned the means of transmitting signals between home security systems and monitoring stations.

I have already determined that the covenant's language embraces all of the arrangements for marketing home security systems which defendant contemplates other than leasing cable channels to independent home security companies. Thus, were I to construe the covenant to embrace the leasing arrangement, the covenant would totally preclude defendant from being able to offer home security services to its subscribers in any franchise area—a consequence which would substantially injure defendant's competitive position in the franchise market (N.T. 4.26–28). Because (1) I am unpersuaded that protecting plaintiff's interest in the goodwill it purchased from

defendant would require enforcing this additional restraint; and (2) the restraint would work substantial hardship upon defendant, I conclude that a construction of the covenant which embraced this restraint would be an unreasonable one. In light of the strained quality of plaintiff's effort to make the leasing arrangement fit within the compass of the covenant language, I find it "reasonably possible" to construe the covenant as not encompassing that arrangement, and, thereby, to preserve its validity in that regard. *See Harris Calorific Co. v. Marra, supra,* 345 Pa. at 468, 29 A.2d 64.

### D. *Is the Covenant Enforceable?*

■ As I have observed, Pennsylvania follows the traditional common law rule of strictly construing covenants not to compete; it does so because such covenants constitute partial restraints of trade, and, therefore, always clash, in some measure, with the common law's policy of encouraging free competition. *Hayes v. Altman,* 438 Pa. 451, 266 A.2d 269, 271 (1970); *Morgan's Home Equipment Corp. v. Martucci,* 390 Pa. 618, 136 A.2d 838, 844 (1953). However, when such covenants are found to be (1) ancillary to an employment contract or to a contract for the sale of a business; and (2) reasonably necessary to protect the legitimate interests of the employer or purchaser, they are enforced by the Pennsylvania courts.[19] *Id.; see also Piercing Pagoda, Inc. v. Hoffner,* 465 Pa. 500, 351 A.2d 207, 210 (1976) (Citing cases).

■ The purpose of allowing enforcement of non-competition covenants when such covenants are ancillary to sales of businesses is to make goodwill a saleable asset "by protecting the buyer in the enjoyment of that for which he pays." 6A Corbin, Contracts §§ 1385, 1387. The Pennsyl-

---

**19.** Pennsylvania courts have also "traditionally held" non-competition covenants ancillary to sales of businesses to a less "stringent test of reasonableness than that which is applied" to restrictive covenants ancillary to employment contracts. *Alabama Binder & Chem. v. Pennsylvania Indus. Chem.,* 410 Pa. 214, 189 A.2d 180, 184 (1963); *Hayes v. Altman,* 438 Pa. 451, 266 A.2d 269, 271 (1970) (contrasting the "few resources" of the typical employee with the "mobility of capital"); *see also* Restatement (Second) of Contracts § 188, Comment *b* ("Courts have generally been more willing to uphold promises to refrain from competition made in connection with sales of good will than those made in connection with employment contracts.")

vania Supreme Court has expressed this rationale in the following fashion.

General covenants not to compete which are ancillary to the sale of a *business* serve the asset known as "good will" which the purchaser has bought. Indeed, in many businesses it is the name, reputation for service, reliability, and the trade secrets of the seller rather than the physical assets which constitute the inducements for a sale. Were the seller free to reenter the market, the buyer would be left holding the proverbial empty poke.

*Morgan's Home Equipment Corp. v. Martucci, supra,* 136 A.2d at 846; *See also, Alexander & Alexander, Inc. v. Drayton,* 378 F.Supp. 824, 829 (E.D.Pa.) *aff'd* 505 F.2d 729 (3d Cir. 1974). In this case WSSI's physical assets were negligible, and, as I have already found, the chief inducements for the sale were its "name [and] reputation for service [and] reliability" in the consumer market. Thus, the instant covenant is plainly one which the Pennsylvania courts would find to be ancillary to the sale of a business.

■ It now remains to determine whether enforcement of the covenant, as I have interpreted it, would be reasonable. The "rule of reason" in the domain of covenants not to compete has two aspects:

(1) Is the restraint on the promissor's activities no greater than is necessary to protect the legitimate interests of the promisee?

(2) Is the promissee's need for protection outweighed by the hardship enforcement would create for the promissor and/or the injury it would work to the public's interests?

*See* Restatement (Contracts) Second, § 188, and Comment *a*; *Bryant Co. v. Sling Test & Repair, Inc.,* 471 Pa. 1, 369 A.2d 1164 (1977). The burden of proving unreasonableness falls on defendant. *Bryant Co. v. Sling Test & Repair, supra,* at 12–13, 369 A.2d 1164; *Harris Calorific Co. v. Marra,* 345 Pa. 464, 29 A.2d 64, 67 (1942).

■ In determining whether a non-competition covenant's restraints are reasonable, courts have naturally focused on the extent of contested covenants, considering their extent along three different dimensions:

1. the types of activities embraced;
2. the geographical area; and
3. the span of time.

*See Restatement, supra,* § 188, Comment *b*; *Piercing Pagoda, Inc. v. Hoffner, supra,* 351 A.2d at 210.

### 1. Types of Activities [20]

This is the dimension of the instant covenant upon which defendant's case for unreasonableness is focused. Defendant contends that were I to read the covenant, as I have read it, to embrace selling home security systems to the public and providing installation, maintenance and/or monitoring services, then the covenant would be void as unreasonable.

■ The general rule is that the terms of a restrictive covenant can be no broader than is necessary "to protect the business sold," *Harbison-Walker Refractories Co. v. Stanton,* 227 Pa. 55, 75 A. 988 (1910), or the "good will purchased." 6A Corbin, Contracts § 1387 (2d ed. 1962). Here, the record of defendant's own statements appraising WSSI's performance and prospects makes it clear that defendant, while it still owned "the business sold," regarded WSSI's chief assets as (1) its capacity to offer, via its distributors, a total package of security systems and services to homeowners/consumers; and (2) its possession of the Westinghouse name and reputation and the recognition these "commodities" enjoyed among consumers. In keeping with this appraisal of WSSI's assets, defendant, sensibly, regarded its prime competitors in the home security market as including those companies which sold security systems to homeowners and offered to them installation, maintenance and monitoring services.

---

**20.** I have already held, *supra,* at 120–121, that the covenant's language does not embrace one type of activity, the leasing of a cable channel, which defendant, through Teleprompter, contemplates undertaking.

I am hard-pressed, therefore, to credit defendant's contention that by undertaking these same activities it would *not* be competing with the business it sold to plaintiff, except in the most formalistic sense. Plaintiff's fortunes today, like WSSI's in 1979, depend upon the success which its "product"—as a package of security system and services—meets in the consumer market.

Corbin cites, as one paradigm case of a restrictive covenant that is too broad in the extent of activities it restrains, the instance where a buyer has abandoned a terrain of business activity occupied by the seller at the time of sale and then sought, by enforcement of a restrictive covenant, to prevent the seller from re-entering that terrain. 6A Corbin, Contracts § 1387 (2d ed. 1962). This is not such a case. Here, plaintiff has continued (1) nationally to advertise and promote "Westinghouse/Westec" security systems and services in the consumer market; and (2) to provide training, counselling and back-up services to its distributors respecting the sale, installation, maintenance and monitoring of "Westinghouse/Westec" systems.

Plaintiff, then is undertaking to exploit the chief assets of the business sold. Were defendant, through Teleprompter, to resume marketing home security systems and services to the public, such activities would plainly compete with plaintiff's undertaking; [21] they would leave plaintiff holding the "empty poke" to which the Pennsylva-

nia Supreme Court alluded in *Morgan's Home Equipment, supra.* Defendant made no showing to dispute Mr. Newlin's testimony that plaintiff would suffer severely in its sales efforts were there to be "two Westinghouses" in the marketplace for home security systems and services.[22] Nor did defendant dispute Mr. Newlin's and Mr. Kenworthy's testimony that several of WSSI's key employees during its period of ownership by Westinghouse remain as employees of defendant, potentially available to lend their experience and expertise in the residential security field to Teleprompter's planned endeavors in the field.[23]

■ I conclude, therefore, that insofar as it embraces the activities of selling home security systems directly to the public and installing, servicing and monitoring such systems, the covenant not to compete is no broader than is reasonably necessary to protect plaintiff's legitimate interests.

### 2. The Covenant's Geographical Area

The covenant contains no express limit on the geographical extent of its operation. However, it is undisputed that the parties intended the covenant not to compete to cover the entire United States. Defendant does not specifically contest the reasonableness of this dimension of the covenant. Defendant has chosen to take the high road, contending simply that the rule of reason demands that I adopt its interpretation of

21. To be sure, defendant's present plans suggest that it would be competing primarily for the custom of homeowners who are also subscribers or potential subscribers of cable t.v. However, the record shows that such competition would cut across a substantial swathe of plaintiff's market, both in terms of (1) the socio-economic class of consumers who purchase home security systems and services, and (2) the overlap between the areas where defendant has received or applied for cable t.v. franchises and the areas where Westec's security systems and services are marketed. (I consider the issue of geographical bounds separately below).

22. As I have noted *supra*, n. 18, defendant has the right to change Teleprompter's name to "Westinghouse" or "Group W," and the record reveals that defendant is seriously considering

such a change. Even absent such a change defendant has proffered no guarantee that Teleprompter in promoting such wares as home security systems and services, would not be identified as a subsidiary of Westinghouse. To the contrary, defendant has underscored its right to dub Teleprompter and its wares by whatever name defendant chooses.

23. Preventing a seller from reentering a business and using, in competition with a buyer, the experience and expertise acquired in the operation of the business sold is an interest which Pennsylvania courts have recognized as a proper basis for making and enforcing covenants not to compete. *See Aiken Industries Inc. v. Estate of Wilson*, 477 Pa. 34, 383 A.2d 808, 816–18 (1978) (dissenting opinion).

the covenant's scope,[24] and that any other interpretation would render the covenant void as unreasonable.[25] I have decided that following defendant's high road is not warranted. Therefore, while I recognize that the various factors which enter into a determination of whether a restrictive covenant is reasonable are, in some measure, interdependent, I have undertaken to give each such factor a degree of particularized attention.

The touchstone of "reasonableness" in scrutinizing the geographical reach of covenants not to compete ancillary to sales of businesses is this: The extent of such covenants must be "limited to the area of potential competition with the purchaser." *Morgan's Home Equipment v. Martucci, supra,* 136 A.2d at 846.

At the time of sale WSSI had distributorships scattered across the nation, conducted nationwide advertising and promotion, and envisioned expanding its distribution network. The covenant was made in the context of both parties' expectation that plaintiff would continue to advertise and promote Westinghouse/Westec security systems and services nationwide and would take steps to expand the then existing network of distributors throughout the United States. Plaintiff has persevered in these endeavors, to the point where it now has twenty-seven distributorships. But these distributorships only serve nineteen states, or portions thereof. While the record reveals that plaintiff plans to add one hundred distributors over the next five years, the record says nothing about where these distributorships might be located, nor does it disclose how concrete and far advanced plaintiff's plans for these distributorships are.

■ Pennsylvania courts are strict in their insistence that restrictive covenants not be enforced over geographical areas

broader than is actually necessary to provide the bargained-for protection from competition. Indeed, Pennsylvania law leaves "no doubt that a court can properly reduce the geographical scope of a covenant" such as the one at bar. *Jacobson & Co. v. International Environment Corp.,* 427 Pa. 439, 235 A.2d 612, 620 (Pa.1967); *Barb-Lee Mobile Frame Co. v. Hoot,* 416 Pa. 222, 206 A.2d 59, 60 (Pa.1965); *Alexander & Alexander, Inc. v. Drayton, supra,* at 830 (citing cases); *see also* 6A Corbin, Contracts § 1390 (2d ed. 1962); 14 Williston, Contracts § 1660.

■ Identifying a reasonably circumscribed geographical area within which this covenant may properly be enforced is a matter of some difficulty. I find two points of reference to be certain: (1) The "area of potential competition" in this case clearly embraces those localities or market areas in which Westec and its distributors currently operate; and (2) in light of the relatively limited number of markets in which plaintiff operates, the entire United States is far too broad an area in which to require defendant and Teleprompter to conform to the covenant's restraints. Such a requirement would impose hardship on defendant beyond the countervailing justification of being necessary to protect plaintiff's legitimate interests. However, it would be neither equitable nor a reasonable construction of the covenant to limit the covenant's geographical breadth to the markets currently served by plaintiff; for, as I have noted, the business sold was one which both parties reasonably anticipated would expand into new markets during the lifetime of the covenant. Therefore, I conclude that plaintiff is entitled to the protection of the covenant, as I have construed it, not only in its present markets but also in those market locales which it enters, via new distributors

---

**24.** In which event, defendant expressly would not dispute the reasonableness of the time period.

**25.** Defendant has, of course, specifically addressed the extent of *types of activities* by

defendant which the covenant can be found to embrace and still remain reasonable and enforceable. But I have rejected, in part, defendant's argument on that ground.

or otherwise, during the life of the covenant.[26]

### 3. The Covenant's Twenty-Year Time Span

Again, defendant does not specifically contest the reasonableness of this dimension of the covenant. However, upon independent consideration in light of the contours of the covenant's restraints as I have construed them, I find the twenty-year extent contemplated by the covenant to be unreasonable.

■ In support of the twenty-year provision, plaintiff contends that it needs ten years in which to recoup a return on its investment and an additional ten year period in which to make a profit. In a similar vein, plaintiff points to "the amount of investment required to be made by a Westec distributor, and the time required to recapture that investment." Plaintiff's Trial Memorandum at 20. Plaintiff's contentions ignore the limited purpose which animates the common law's tolerance of covenants not to compete. That purpose is to protect the buyer's interest in the good will purchased; it is not to permit one to purchase freedom from competition. Thus, the measure of reasonableness in this context has been articulated by the Pennsylvania Supreme Court as being "the period required for the purchaser to establish his own customer following." *Morgan's Home Equipment, supra*, 136 A.2d at 846. Similarly, Corbin writes,

no restraint is ever necessary or reasonable for a longer period of time than the good will built up by the seller and sold to the buyer can reasonably be expected to continue... The seller's promise should never bind him after his re-entry into the business would affect the buyer's business no more than would his entry as a stranger. 6A Corbin, Contracts § 1391 (2d ed. 1962).

Plaintiff cites no authority, and I have found none, for the proposition that a court may gauge reasonableness in this context by prophecying the time required for a buyer to make a purchased business profitable.[27]

The agreement of sale envisioned a transitional period of five years during which plaintiff would endeavor to transfer public recognition of "Westinghouse" security systems and services to "Westec" security systems and services. Nothing in the record suggests that an additional fifteen years would need to elapse before the re-entry of Westinghouse into the residential security business would affect plaintiff no more than would a "stranger's" entry into the business—albeit a stranger with formidable financial resources and, perhaps, a reputation for reliability in electronics fields other than residential security systems.[28] That being the case, to hold the covenant enforceable for twenty years would impose (1) a restraint on competition greater than is necessary to protect plaintiff's legitimate interests and (2) an unreasonable hardship on defendant.

---

**26.** At the conclusion of this opinion I direct the parties, *inter alia*, to attempt to fashion an agreed process for protecting their respective rights and interests as I have set them forth in this opinion. If the parties are unable to agree upon such a process they are directed to submit separate proposed orders and supporting memoranda to assist the court in fashioning a final order in conformity with the findings and conclusions rendered today.

**27.** Plaintiff would have me rely on *Alexander & Alexander, Inc. v. Drayton*, 378 F.Supp. 824 (E.D.Pa.) aff'd, 505 F.2d 729 (3d Cir. 1974), but that case does not really take plaintiff very far. It is true that *Drayton* endorsed, in dicta, "long-term protection against immediate competition

by the sellers," *id.* at 831; but it did so with regard to protecting buyers of an insurance partnership against the spectre of sellers' exploiting their "close personal contacts" in competition with the business sold. *Ibid.* Only within that factual context, one plainly involving the sale and protection of good will, and not the mere play of market forces, did the *Drayton* court speak of protecting the buyer's investment from the risk of competition.

**28.** Mr. Newlin testified that, in negotiating the agreement of sale on plaintiff's behalf, he would have "settled for" a time limit of twelve years on the covenant not to compete (N.T. 2.67).

■ As I have already observed, there is ample authority in the decisions of the Pennsylvania Supreme Court to support a chancellor's "fair modification" of covenant restraints found to be too broad. *Barb-Lee Mobil Frame Co. v. Hoot, supra,* 206 A.2d at 60; *Jacobson & Company, Inc. v. International Environment Corp., supra; Morgan's Home Equipment Corp. v. Martucci, supra; see also Alexander & Alexander, Inc. v. Drayton, supra* at 830 ("[N]o equitable principle ... precludes modification" of both the time and geographical limitations in a covenant not to compete when each is found to be too broad). However, past decisions provide no mathematical formulae for determining a reasonable time limit here; this is necessarily so, because "reasonableness is dependent upon an analysis of the facts of a specific case." *Alexander & Alexander, Inc. v. Drayton, supra* at 831.

■ In considering what would constitute a reasonable period within which plaintiff may establish its identity and "customer following" free from defendant's competition, I find from the record that one's "good name" in the field of providing home security systems and services rests largely on one's reliability over time in providing maintenance and monitoring service. I note also that the Tradename License Agreement between the parties envisions a five-year period during which plaintiff would seek to transfer public recognition of "Westinghouse" security systems to "Westec." In light of all the circumstances, I conclude that a restraint of ten years, rather than the twenty years contemplated by paragraph 16, represents a reasonable period of protection for plaintiff.

### 4. Hardship to Defendant

In examining this factor, I begin with the recognition that defendant is a large and sophisticated corporation, capable of anticipating the future legal consequences of decisions such as those involved in entering the covenant,[29] and possessed of considerable bargaining power. More important is

---

29. WSSI management was aware of the potential use of cable t.v. for residential security

---

the fact that, under the interpretation of the covenant which I have adopted, Teleprompter can lease a cable channel to a home security company which home security company can offer home security systems and services to Teleprompter's cable t.v. subscribers during the life of the restrictive covenant. The record shows that independent home security companies selling equipment and services compatible with use via coaxial cables are plentiful in the areas where Teleprompter now has franchises and those in which it has applications pending. Teleprompter may seek to lease cable channels to such companies, and in that manner include home security services among the services its potential subscribers may be able to enjoy.

■ Nothing in the record persuades me that constraining Teleprompter in this fashion imposes on defendant a hardship outweighing that which plaintiff would suffer were I to deny plaintiff the relief to which the covenant otherwise entitles it.

### 5. The Public Interest

■ The record suggests that the home security systems market is an intensely competitive one. While Mr. Mathis did testify that the use of cable television systems for residential security services offers a price advantage to consumers, the record simply will not support a finding that the overall market in home security systems and services, via cable t.v. channels or otherwise, will be restrained in any significant degree as a consequence of enforcing the covenant as I have construed it. *See Bryant Co. v. Sling Test & Repair,* 471 Pa. 1, 13, 369 A.2d 1164 (1977).

Accordingly, the public interest does not require that I forbear from enforcing the covenant.

### III.

### CONCLUSION

An Order will enter announcing the rights of the parties in conformity with the

---

systems well before the time of the sale (P–25).

findings and conclusions enunciated in this opinion. To aid in the formulation of that Order the parties are requested to submit, by April 26, 1982, a Proposed Form of Order. The parties are requested to make every effort to reach agreement upon the form of Order; if they are unable to do so, each party will submit its own preferred version. These submissions will be without prejudice to the entitlement of each of the parties to maintain, in this court and on appeal, its substantive position with respect to issues on which it believes the opinion filed today to be in error.

In preparing their submission(s) the parties are requested to bear in mind the following:

1. As understood by the court, the restrictive covenant is nationwide in scope. However, it would be an undue hardship for the defendant to be required to conform to the covenant in markets not served by the plaintiff. As of today the plaintiff only operates in a limited number of markets. It appears, however, to be plaintiff's intention to expand its activities in the years ahead. In formulating their proposed draft order, the parties are requested to undertake to develop an agreed process for protecting defendant's entrepreneurial freedom in markets not now served by plaintiff until such time as it clearly appears that plaintiff will enter a particular market in the very near future. The proposed draft order should be cast both in declarative and in injunctive form: see paragraph 3, infra.

2. Applying Pennsylvania law, the court has determined that the twenty-year restraint contemplated by paragraph 16 is ten years too long. The question of the reasonableness of a twenty-year restraint in jurisdictions other than Pennsylvania has not been briefed by the parties or independently researched by the court. The parties are requested to undertake to reach agreement on the reasonable enforcement time period(s) in jurisdictions outside Pennsylvania; if the parties can so agree, they are requested to explain the basis for such agreement in their joint submission. If, bearing in mind the second sentence of paragraph 16 and such other factors as the parties deem relevant, the parties are unable to reach agreement on this issue, they are to make separate submissions accompanied by supporting memoranda of law.

3. The parties have joined issue on the following question: Assuming that the court construes the covenant to prohibit activities in the field of home security systems which defendant, through Teleprompter, plans to undertake, what form of relief would be warranted? Plaintiff has contended that injunctive, as well as declaratory, relief would be mandated. Defendant has argued that only a declaratory judgment would be proper. Today's opinion determines that the covenant does inhibit defendant, in some substantial measure—albeit not to the extent plaintiff has contended for. Now that the parties are apprised of the court's conclusions with respect to the effective contours of the covenant, it may well be that their respective views on the question of the form of remedy will come into clearer focus. The parties are, therefore, requested to brief the injunction versus declaratory judgment issue again, in the light of today's opinion.