**DE LONG CORPORATION, Plaintiff-Appellee,**

v.

**Joseph E. LUCAS, Defendant-Appellant.**

**No. 282, Docket 26004.**

United States Court of Appeals
Second Circuit.

Argued April 7, 1960.

Decided May 11, 1960.

---

Edward J. Ennis, New York City, (Clifford Forster, New York City, and John L. Ingoldsby, Jr., Washington, D. C., on the brief), for plaintiff-appellee.

James B. Donovan, New York City, (Watters & Donovan, New York City, on the brief), for defendant-appellant.

Before LUMBARD, Chief Judge, and HINCKS and FRIENDLY, Circuit Judges.

FRIENDLY, Circuit Judge.

Our task on this appeal has been immeasurably lightened by Judge Bryan's comprehensive opinion, D.C.S.D.N.Y. 1959, 176 F.Supp. 104. Indeed, the opinion has received the highest possible tribute—a large measure of acquiescence from the parties. Defendant Lucas has not appealed from the direction that he assign to plaintiff his patent applications for a derrick barge and for a well drilling and servicing barge; and plaintiff DeLong has not appealed from the denial of its demand that Lucas assign to it his patent application for a cable jack. The sole issue on which appeal has been taken is the determination that Lucas is liable to DeLong for damages of $801,880.03 for breach of an agreement not to compete. Even as to this there is no serious quarrel with Judge Bryan's findings of specific facts as distinguished from the inferences and conclusions drawn therefrom. We shall state only such facts as we deem essential, relying on the District Judge's opinion for the rest.

The controversy stems from a settlement agreement dated June 10, 1953 between various DeLong enterprises, therein referred to as the First Party, and Lucas, a former employee of DeLong, therein referred to as the Second Party. Lucas agreed, among other things,

"(b) For a period of two (2) years after the signing of this

Agreement not to compete or assist anyone to compete with the First Party in any business related to the Second Party's former employment by the First Party consisting of engineering and sales of docks, barges, platforms and similar equipment for marine and/or oil field use including equipment making use of self-elevating mechanisms, pneumatic, mechanical, manual or otherwise any place in the world.

"(c) For a period of two (2) years after the signing of this Agreement not to divulge to any one any trade secrets or confidential information concerning the business of the First Party learned by the Second Party during his employment."

We need concern ourselves only with the former covenant.

DeLong was an engineer of wide experience. Both before and immediately after World War II, he was associated with the large contracting firm, Morrison-Knudsen Company, hereinafter MK. His postwar activities with MK included the construction of oil drilling platforms in the Gulf of Mexico. In 1949, about the time when DeLong severed his connections with MK, he undertook a new development in this art. This consisted of a floating platform with a number of caissons affixed; the caissons would be let down to the sea floor through openings in the platform and at the same time would project above the deck so that a jacking device could raise the platform on the caissons sufficiently above the water to avoid destructive wave action.

Lucas, although not professionally trained, had broad practical engineering experience. He, too, had worked with MK. Late in 1949 DeLong invited Lucas to join DeLong in the development of DeLong's plan for self-elevating offshore drilling platforms and new jacking mechanisms. Lucas did this early in 1950. He remained in DeLong's employ until the settlement agreement of June 10, 1953. The type of platform developed by DeLong proved to have a number of uses other than for drilling. DeLong installed a dock utilizing this principle for the Army at Thule, Greenland, sold a number of "package ports" to the Army Transportation Corps, and installed a dock on the Orinoco River in Venezuela for the shipment of iron ore.

Under date of May 29, 1952, DeLong and Lucas entered into a written agreement covering Lucas' employment from March 1, 1950 until terminated by either party on 30 days' notice. The agreement stated that Lucas' employment "has been for the principal purposes of assisting with engineering and sales of docks, barges, platforms and similar equipment for marine and/or oil field use including equipment making use of self-elevating mechanisms, pneumatic, mechanical, manual or otherwise." Lucas agreed to continue to devote himself to "the welfare of that part of DeLong's business." Among other things he was to "report to DeLong all engineering developments in connection with this business and all information available * * * concerning prospective sales." During the term of his employment and for ten years thereafter Lucas was not to divulge information with reference to DeLong's business obtained during his employment and not to "compete or assist anyone to compete with DeLong in the phases of DeLong's business involved in your employment."

In the spring of 1953 disputes arose as to the payment of sums alleged to be owing to Lucas, and he commenced to look elsewhere. Before that, while in Venezuela in 1952, he had had certain discussions with Morrison, president of MK, and Kennedy, vice-president in charge of MK's South American operations. In March 1953, while still in DeLong's employ, he went to MK's headquarters in Boise, Idaho, for further talks. This led to DeLong's bringing an action to restrain Lucas from accepting employment with competitors and revealing trade secrets in violation of his employment agreement. The action was settled by the agreement dated June 10, 1953 here in suit. DeLong paid Lucas

$184,547.50 for services rendered; Lucas assigned to DeLong all Lucas' rights in a patent application covering a slip jack; and Lucas made the further agreements set forth above.

DeLong continued exploiting its device for offshore oil drilling. In 1954 a still further use for its dock appeared. De-Long, in a joint venture with Raymond Concrete Pile Company, obtained a ne-gotiated contract from the Navy's Bu-reau of Yards and Docks to construct an advance warning radar station off the northeast coast, known as Texas Tower No. 2, utilizing the DeLong concept and method of construction. The Navy in-tended this to be the first of a number of such towers.

After severing his connection with De-Long, Lucas first obtained a contract to install channel markers and navigational aids on the Orinoco River in Venezuela. Concededly this did not violate his agree-ment not to compete. However, Lucas' interest in jacking mechanisms contin-ued. In July, 1953, he sent to his patent counsel in the United States rough pen-cilled sketches of a cable jack for use on self-elevating mechanisms based on a me-chanical process rather than the com-pressed air method DeLong had used. Early in 1954 Lucas discussed his new jack with officers of MK. In August he conferred in San Francisco with Dunn, an MK vice-president, as to his projected oil drilling barges and jacking devices. Interoffice correspondence shows that Dunn was rather negative about this. However, Kennedy and, still more impor-tant, Morrison, took a different view. Another MK vice-president, Bonny, add-ed to Morrison's interest by reporting "There are scheduled offshore on the At-lantic banks a number of large projects to be constructed * * * for offshore ra-dar and Nike stations which are pro-posed to use a similar platform and which are said to run in the neighborhood of $20,000,000 a piece." On September 14 Lucas met with Morrison, Kennedy, Bon-ny, Zapp (MK's counsel) and other MK executives at MK's headquarters at Boise. Although the testimony as to

what then occurred is vague, a memo-randum prepared by Lucas under date of April 18, 1955 makes it clear that at the September 14 meeting MK agreed to advance monies to Lucas for financing engineering studies and building a proto-type of his jack. Lucas' settlement agreement with DeLong had been ex-hibited to MK's counsel before the meet-ing. It was understood that until June, 1955, Lucas was not to solicit business competitive with DeLong and that his activity was to be entirely in engineering and development; this was thought to be permissible under his contract.

The arrangements between Lucas and MK were formalized under date of April 20, 1955. MK was to advance to Lucas up to $100,000 for development work to enable MK to determine the workability of the Lucas system for marine oil field construction, well drilling and servicing equipment and to decide whether MK wished to purchase it. If the purchase option was exercised, MK was to pay Lucas an amount equivalent to 10% of any profit realized or stemming from the use of the Lucas system, to give Lucas a 10% interest in any entity making use of the system under license or permission from MK, and to employ Lucas as an executive at a salary of $2,000 per month.

Without awaiting the formalization of his arrangements with MK, Lucas, with Kennedy's approval, had gone forward in engineering studies and in completing the drawings and designs for the prototype of his jack, and had begun negotiations for its fabrication. During this same period MK intensified its interest in the anticipated government business. MK had been developing an offshore platform in conjunction with two other companies, Pacific Bridge and Terminal Drilling. Morrison wrote Bonny that he planned to "discuss this matter with Mr. Kennedy and make further inquiry of when Joe Lucas might be available * * * I would think our use for Mr. Lucas would be to assist in getting a tower built as a basis of cost and information which would presumably be helpful for further

work." Further conferences were held with the Navy in Washington, none, of course, attended by Lucas. It is not clear how far Lucas' jack figured in these early discussions. Apparently Lucas was working under the general direction of Kennedy, whereas Dunn was the chief MK representative in the talks with the Navy at this stage. But Dunn testified that if MK used the Lucas jack "at all, I thought they might be going to bid the Navy towers or use it for oil platforms." At the very least, Lucas' jack gave MK an added string to its bow. Meanwhile the construction of the prototype jack was being completed; it was tested in September in the presence of Lucas and representatives of MK.

On September 9, 1955 the Navy Department released invitations to bid on three additional Texas Towers. The bids were to be opened on November 1. For the combination of Texas Towers 3 and 4 which proved to be the only towers on which the Navy let a contract, a joint venture of DeLong and Raymond Concrete Pile bid $16,890,157. Another joint venture, composed of MK and J. Rich Steers, Inc., bid $16,431,000 and received the award. The estimates underlying the MK-Steers bid included the Lucas jack at a cost of $248,000. Other jacks for which MK-Steers had obtained quotations from Roebling and McKiernan-Terry cost $757,000 and $1,100,000 respectively. A few hours before the bids opened, an agreement was executed between Lucas and MK providing for the use of the Lucas system in the Texas Towers and for payment to Lucas of 10% of the profits.

Upon the award of the Navy contract to MK-Steers, DeLong brought this action against Lucas. Federal jurisdiction was based on diversity of citizenship. Judge Bryan held that Lucas' activities with MK violated the no-competition clause of the settlement agreement and that this was the proximate cause of the loss of the Navy contract by DeLong-Raymond to MK-Steers. He found DeLong had been damaged in the amount of the estimated profits of the joint venture that would have gone to it. However, he declined to compel Lucas to assign the patent application for his cable jack because, p. 130, "there was nothing in the settlement agreement prohibiting Lucas from developing ideas or improvements of his own during the non-competitive period" and insofar as Lucas' activities in collaboration with MK constituted a violation of his agreement not to compete "I have already awarded DeLong the damages which it proved arose from such violations."

Appellant challenges Judge Bryan's conclusion of violation of the agreement not to compete both on general grounds and specifically as inconsistent with the judge's refusal to order Lucas to assign to DeLong the patent application for the cable jack. He also contests the conclusion that such a violation was the proximate cause of DeLong-Raymond's loss of the Navy contract. Finally he contends DeLong did not adequately prove its damages. Finding Judge Bryan's conclusions on all these points to be warranted, we affirm.

■ Appellant relies on statements that "An agent need not wait until he is on the street before he looks for other work. He may plan and prepare, during the agency, to engage in a competing business after it ceases," Keiser v. Walsh, 1941, 73 App.D.C. 167, 118 F.2d 13, 14, see also Meyers v. Roger J. Sullivan Co., 1911, 166 Mich. 193, 196–97, 131 N.W. 521, 522–523, 34 L.R.A.,N.S., 1217. Appellant argues no stricter rule should apply to a post-employment period covered by a no-competition agreement. Judge Bryan so held, as we do. We need not debate just how far Lucas could have gone on his own without violating the covenant not himself to compete; if Judge Bryan was wrong in thinking a patent application was not too far, and we do not say he was, it is not an error of which Lucas can complain. Here liability is predicated on Lucas' violation of his covenant not to "assist anyone to compete."

■ We think it clear that if during the two-year period Lucas had entered

MK's employ to work on self-elevating mechanisms, he would thereby have violated his no-competition agreement—even though his work was entirely engineering and neither he nor MK approached customers until June 11, 1955. The agreement prohibited action during the two-year period to "assist anyone to compete with the First Party in any business relating to the Second Party's former employment by the First Party consisting of engineering and sales of docks," etc. Engineering was as much a part of DeLong's "business" as "sales." In an enterprise like DeLong's, sales are inevitably preceded by a long period of engineering; as Judge Bryan said, "Texas Towers do not spring forth in full bloom" 176 F.Supp. at page 123. For the two-year period DeLong's competitors were not to have Lucas' assistance in either engineering or sales.

Although MK and Lucas avoided an employer-employee status during the two-year period of the agreement not to compete, their relations were not essentially different as regards the issue here. Lucas' April 18, 1955 memorandum states that at the September 14, 1954 meeting in Boise "the Board of Directors of MK authorized the expenditure of $100,000 as recommended for the preliminary financing, including a drawing account for the writer on the premise that a mutually satisfactory participation would be worked out before any funds were released." Such a participation was worked out at least by April 20, 1955. We need not consider whether Lucas' agreement not to assist a competitor would have been violated if the arrangements had gone no further than the advance of money by MK to Lucas, see Salzman v. Siegelman, 1905, 102 App. Div. 406, 92 N.Y.S. 844, which could be argued to be assistance by MK to Lucas rather than by Lucas to MK. The relationship here went considerably beyond this. Lucas' April 18, 1955 memorandum tells us that "the filing of patent applications in all foreign countries having off-shore oil potential, was started in August, 1954, and completed in January, 1955, with the approval of Mr. M. G. Kennedy," a vice-president of MK. After describing the engineering work that had been done, it states "All of the above work was discussed with Mr. Kennedy and his approval secured before commitments were made." The relationship was not a one-way street; during the two-year period, while Lucas was getting MK's money, MK was getting Lucas' know-how and the assurance that, subject to the usual hazards of manufacture and test, it would have the Lucas system available shortly thereafter and in time for use in bidding for the Texas Towers. MK obtained the prospect also that the work being done by Lucas during the two-year period would enable it, as stated in the April 18 memorandum, to submit data "to the oil companies for comment about June 15." This was exactly the kind of head start the agreement not to assist a competitor in engineering during the two-year period was intended to prevent. It would be most surprising if a no-competition agreement having its source in an earlier attempt by Lucas to put his skills concerning floating docks and jacking mechanisms at MK's disposal allowed precisely that.

Appellant insists that the conduct of the parties showed they did not construe the contract as prohibiting this kind of cooperation between Lucas and MK so long as no business was solicited during the two years. Emphasis is placed on the statement in Lucas' April 18, 1955 memorandum that "At the meeting [of September 14, 1954] it was pointed out that the writer could not engage directly or indirectly in the marine oil well drilling business until June 10, 1955, because of a non-competition settlement contract with L. B. DeLong, but engineering and design work was permissible before then"; such a self-serving statement by the party charged carries little weight. Three other episodes relied on by Lucas are likewise inconclusive. Late in 1953 or early in 1954 DeLong discussed with Dunn of MK that MK and Lucas had been talking about going into business competitive with DeLong at the end of

the two years. Lucas seeks to spell out from DeLong's inaction an endorsement of his interpretation of the contract, but when all the testimony is read, it does not bear the weight thus sought to be put upon it. DeLong's chief engineer, Suderow, testified that Lucas had telephoned early in 1955 for cost data in regard to jacks and added that "he was going to build some jacks, that he was going to murder us, together with MK on the next Texas Towers that were coming out"; Lucas urges that if DeLong had thought this a violation of the contract, DeLong would have sued then and there. However, DeLong could have been relying on the negative attitude toward an MK-Lucas association which he claimed Dunn took at the earlier San Francisco meeting, and parties should not be expected, under pain of an inference of acquiescence, to rush into court on the basis of threats that may never be carried out. Even less persuasive is the evidence that DeLong's engineers photographed the Lucas prototype in September, 1955; that the president of Raymond Concrete heard late in October that MK-Steers was planning to submit a bid for the Texas Towers, probably utilizing the Lucas jack; and that DeLong made no protest to Lucas. Any inference of acquiescence from this and similar evidence is rebutted by DeLong's memorandum of Nov. 7, 1955, to the Navy Department protesting that Lucas "in active concert and participation with Morrison-Knudsen Construction Co. did, prior to June 11, 1955, actively engage in competition with DeLong," etc.

■ We find no error in Judge Bryan's conclusion that Lucas' violation of the no-competition agreement was the proximate cause of DeLong-Raymond's loss of the Navy contract to MK-Steers. The margin between the two bids was very small, $459,000 on a $16,000,000 job. The difference between the two was $50,000 less than the difference in cost between the partially tested Lucas jack and the untested Roebling jack and $393,000 less than the difference between the Lucas jack and the untested Mc-Kiernan-Terry jack. The Lucas jack was available for MK-Steers' use in October, 1955, because Lucas had assisted MK before June 10, 1955 in violation of his contract. We find no force in appellant's argument that the MK bid contained a sufficient profit margin that MK could have used the Roebling jack, as in fact it decided to do "because of the lawsuit pending." It is not to be assumed that if MK had bid on that basis, it would have sacrificed the margin included in its bid, which took account of the risks involved in transportation to an offshore site and the fact that "none of the jacking systems available to us had been completely tested out." Indeed the above figures understate the cost differentials among the jacks since they do not include the profit and overhead items customarily added. DeLong was not required to show that MK-Steers could not possibly have been the successful bidder but for Lucas' contract violation; it was enough to show that the violation in fact had a causal relation to MK-Steers' success and DeLong's loss.

■ The District Judge determined DeLong's damages on the basis of its 37½% share in the DeLong-Raymond joint venture's estimated profit of $1,-691,652, or $634,369.54, plus $12,685.90 to which DeLong would have been entitled as jack rentals. This was a profit margin of some 11%. Appellant's attack on this as too speculative is unpersuasive. The estimates were made by experienced contractors in the ordinary course of business. To be sure, unexpected bad luck, such as poor weather, might have reduced or eliminated the profit, just as good luck might have augmented this. In fact the weather during the period when MK-Steers carried out the construction was excellent; significantly appellant introduced no evidence as to what MK-Steers' profit was. Where the wrong "itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve

the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." Story Parchment Co. v. Paterson Parchment Paper Co., 1931, 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544. See Bigelow v. RKO Radio Pictures, Inc., 1946, 327 U.S. 251, 264–266, 66 S.Ct. 574, 90 L.Ed. 652.

Judgment affirmed.