**VIAD CORPORATION, Plaintiff,**

v.

**C. Alan CORDIAL, Clifford Hellberg, and Calan Communications, Inc., Defendants.**

No. CIV.A.03–1408.

United States District Court, W.D. Pennsylvania.

Dec. 24, 2003.

Timothy P. Ryan, Daniel B. McLane, Eckert, Seamans, Cherin & Mellott, Pittsburgh, PA, Sid Leach, Snell & Wilmer, Phoenix, AZ, for plaintiff.

Robert M. Linn, Alyze L. Pierce, Cohen & Grigsby, Pittsburgh, PA, for defendants.

## *OPINION*

HARDIMAN, District Judge.

### Introduction

This case involves claims of unfair competition brought by Viad Corporation ("Viad") against two of its former employees, C. Alan Cordial ("Cordial") and Clifford E. Hellberg ("Hellberg") and the company they founded, calan communications ("calan"). Cordial and Hellberg were employed by a division of Viad known as Exhibitgroup, which is one of the nation's largest exhibit houses. The gravamen of Viad's Complaint is that Defendants Cordial and Hellberg violated contracts which prohibited them from competing with Exhibitgroup directly or indirectly, or aiding its competitors, for a period of one year following the termination of their employment. On December 3 and 4, 2003, the Court held a hearing on Plaintiff's Motion for Preliminary Injunction at which the parties were represented by counsel who tried the matter skillfully and efficiently. For the reasons that follow, Plaintiff's Mo-

tion for Preliminary Injunction will be denied.

### Findings of Fact

Based on the testimony and documents admitted into evidence, and upon consideration of the proposals and stipulation submitted by the parties, the Court makes the following findings of fact:

1.  Plaintiff Viad commenced this action by Complaint on September 23, 2003. On October 22, 2003, Viad filed the Motion for Preliminary Injunction that is the subject of this Opinion.

2.  Viad is a Delaware corporation with its principal place of business at 1850 North Central Avenue, Phoenix, Arizona 85077. (Second Joint Proposed Findings of Fact for Preliminary Injunction Hearing, hereafter "Stip." ¶ 1). According to its Form 10–K for Fiscal Year Ending December 31, 2002, Viad had total revenues of over $ 1.6 billion.

3.  This action involves a division of Viad called Exhibitgroup/Giltspur ("Exhibitgroup"). (Stip.¶ 4). Exhibitgroup accounted for $217 million of Viad's $1.6 billion in total annual revenue (or approximately 13.5%). (Trial Transcript ("Tr."), Vol. I at p. 96, ll. 21–23).

4.  Exhibitgroup is an exhibit house that provides services to companies participating in trade shows and conventions, including exhibit design, construction, transportation, installation and storage. (Stip.¶ 5).

5.  Exhibitgroup has approximately 800–1,000 employees, with operations in more than a dozen locations in the United States, Canada and Europe. (Stip.¶ 6).

6.  Defendant calan communications is a Pennsylvania corporation with a registered address at the residence of Defendant Hellberg, 319 Blue Run Road, Cheswick, Pennsylvania 15024. Calan was incorporated in late March, 2003 by Defendants Cordial and Hellberg, as well as former Exhibitgroup Vice–President of Sales and Marketing, Cindy Provencher ("Provencher"). (Stip. ¶¶ 20, 21; Cordial Aff. ¶ 4: Hellberg Aff. ¶¶ 3–4). Calan has three principals and no other employees. (Stip.¶ 21).

7.  Calan is in the business of developing computer software programs that will be marketed to exhibit houses and companies with similar software needs in other industries. (Stip. ¶ 22; Cordial Aff. ¶ 6; Hellberg Aff. ¶ 6).

8.  Calan is not an exhibit house. It does not design, or construct exhibits, and does not sell products or services to any of Exhibitgroup's customers. (Cordial Aff. ¶ 7; Hellberg Aff. ¶ 7).

9.  Defendant Cordial is an individual residing at 405 Fern Hollow Lane, Wexford, Pennsylvania 15090. (Stip.¶ 2). Cordial has more than 27 years of experience in the exhibit house industry, and gained extensive experience, skill and expertise in marketing and customer account management. (Cordial Aff. ¶ 10).

10.  Defendant Hellberg has 21 years of experience in the exhibit house industry and in sales, marketing and business management. (Hellberg Aff. ¶¶ 11–12). Hellberg also has substantial skill, experience and expertise in computer software program development. *Id.*

11.  Prior to February 22, 2000, Cordial and Hellberg were both employees and shareholders of a Pittsburgh-area company called Gardner Displays Company ("GDC"), which conducted business under the trade name of Creative Productions. (Stip.¶ 7). Like Exhibitgroup, GDC was in the business of designing, constructing and installing exhibits for companies planning to promote or display their products or services at trade shows and similar events. (Cordial Aff. ¶ 9).

12. Cordial was employed by GDC from 1981 through February 22, 2000, (Stip.¶ 8), serving as President from 1997 to 2000. (Cordial Aff. ¶ 10). At GDC, Cordial secured and managed major customer accounts. *Id.*

13. Cordial has been active as a member of the board of directors of the Exhibit Designers & Producers Association, an exhibit house trade group. (Cordial Aff. ¶ 11). In that capacity, Cordial gained substantial exposure to the use of software targeted at the exhibit house industry, including a broad range of commercial computer software providers. *Id.*

14. Hellberg was employed by GDC from 1989 through February 22, 2000. (Stip.¶ 9). He was promoted to General Manager of GDC in 1998. (Hellberg Aff. ¶ 13).

15. During his employment at GDC, Hellberg managed customer accounts and oversaw the development and writing of a GDC software program that was used to coordinate customer services and facilitate accounting of expenditures (the "GDC software program"). (Hellberg Aff. ¶ 14).

16. The GDC software program also made it possible to work collaboratively with customers on documents, including exhibit plans. (Hellberg Aff. ¶ 15).

17. GDC had developed software useful in designing, building, and installing convention, trade show, museum and other exhibits and displays. The GDC software program allowed the company to compete effectively with larger companies like Exhibitgroup. (Tr., Vol. I at pp. 10–11).

18. The GDC software program was developed for and in cooperation with the Ford Motor Company, which was then a major GDC customer. (Hellberg Aff. ¶ 16). The use of the software was later expanded to other GDC customers. *Id.*

19. In 1994, Ford moved its business from GDC to a competitor company called Exhibit Works. As part of that transition, the functions and capabilities of GDC's software program were fully disclosed in or about 1994. (Hellberg Aff. ¶ 17).

20. From 1989 through February, 2000, GDC increased its annual revenues from approximately $8 million to more than $30 million. (Cordial Aff. ¶ 12; Hellberg Aff. ¶ 18).

21. By February 2000, GDC was one of the leading exhibit houses in Western Pennsylvania and serviced valuable national accounts, including, Sony, AT & T, Mitsubishi, Volvo and Polaroid. (Cordial Aff. ¶ 12; Hellberg Aff. ¶ 19). Cordial's accounts at GDC collectively generated $17 million of GDC's annual revenue. (Cordial Aff. ¶ 12).

22. Exhibitgroup first proposed a potential merger of Exhibitgroup and GDC in 1998. (Cordial Aff. ¶ 13; Hellberg Aff. ¶ 20). After subsequent negotiation, Exhibitgroup and GDC entered into a Merger Agreement on February 22, 2000. (Stip.¶ 10).

23. Pursuant to the terms of the Merger Agreement, Exhibitgroup paid $22,000,000 to acquire all the assets of GDC. As GDC shareholders, Hellberg received $3,672,461 and Cordial received $978,099 pursuant to the merger. (Stip.¶ 11).

24. GDC's shareholders understood that Exhibitgroup wanted to acquire the company in order to obtain its customer accounts and goodwill. (Cordial Aff. ¶ 14; Hellberg Aff. ¶ 23), and that the GDC software program was not a significant factor in the negotiations between the parties to the merger. (Ex. 3; Cordial Aff. ¶ 14; Hellberg Aff. ¶ 23).

25. GDC's shareholders expressly represented to Exhibitgroup that the GDC

software program was not a trade secret. (Ex. A, Schedule 4.1(k)). Specifically, the Merger Agreement's description of the intangible assets being acquired by Exhibitgroup stated that the management of GDC believed and represented that the technical and business information collected by GDC during its 60 years' of operation was not, "in and of itself, a material invention, development, discovery, technology, improvement, process, formula, design [or] trade secret . . . which is licensed to or owned in whole or in part by the Company." *Id.*

26. In connection with the merger, Cordial and Hellberg were offered employment at Exhibitgroup to help ensure that GDC's former clients did not defect to Exhibitgroup competitors. (Cordial Aff. ¶ 16; Hellberg Aff. ¶ 25).

27. On February 22, 2000, Cordial entered into an Employment, Covenant Not to Compete and Confidentiality Agreement with Exhibitgroup ("Cordial Contract"), pursuant to which he was named Senior Vice President—Strategic Global Accounts, reporting to the President and Chief Executive Officer. (Stip.¶ 12). Cordial later served as Executive Vice President of Sales and Marketing for Exhibitgroup. (Cordial Aff. ¶ 20).

28. Cordial's Contract provided an initial employment term with Exhibitgroup of three years, from February 22, 2000 until February 21, 2003. (Stip.¶ 13).

29. Like Cordial, Hellberg entered into an Employment, Covenant Not to Compete and Confidentiality Agreement ("Hellberg Contract") on February 22, 2000, pursuant to which he was named Vice President of Operations for the Pittsburgh region. (Stip.¶ 14).

30. Hellberg's Contract provided an initial employment term with Exhibitgroup of three years, from February 22, 2000 until February 21, 2003. (Stip.¶ 15).

31. Both Cordial and Hellberg each executed an agreement entitled "Joinder to Merger Agreement," by which they agreed to join in and be bound by the terms of the Merger Agreement. (Ex. 9).

32. A material portion of the consideration paid to Cordial and Hellberg pursuant to the Merger Agreement and their employment agreements (collectively, the "Employment Agreements") was paid in order to obtain the restrictive covenants. (Exs. B and C at § 8.1).

33. The Employment Agreements defined the term "Employer's Business" as follows: "[Exhibitgroup] designs, builds and installs convention, trade show, museum and other exhibits and displays." (Exs. B and C at Recitals, ¶ B). The Employment Agreements incorporated by reference the definition of GDC's Business from the Merger Agreement. (Exs. B and C at Recitals, ¶ A and Definition, § 1). The Merger Agreement, in turn, defined GDC's "Business" as: "the design, engineering, fabrication, shipment, installation, dismantling and storage of trade show exhibit and trade show displays." (Ex. A, Schedule 1.1).

34. The Employment Agreements also provide, in pertinent part:

*Non–Competition Covenants:*

Employee hereby covenants and agrees that for a period of three (3) years following the Closing [of the Merger] and for an additional period of one (1) year thereafter or, if longer, for a period of one (1) year following expiration of the [three-year] Term . . . Employee shall not, within the E/G Business Territory, engage directly or indirectly, either for himself or for another, or as an employee, partner, consultant, affiliate, or controlling shareholder of any person or entity so engaged, in any business that owns or operates any activity which

competes with the Business or Employer's Business, nor compete, or aid another to compete, nor solicit or induce any other employee of Employer or GDC to terminate employment with Employer or GDC or compete in any way with the Business or Employer's Business.

(Exs. B and C at § 8.1).

35. When Cordial and Hellberg joined Exhibitgroup, the company indicated that it planned to expand the GDC software program and invest in improvements to expand its capabilities. (Cordial Aff. ¶ 27; Hellberg Aff. ¶ 35). Those plans were not carried out. *Id.*

36. The GDC software did not have the capacity to support additional users, and was incompatible with Exhibitgroup's existing technology. (Hellberg Aff. ¶ 35). Accordingly, the use of the GDC software was phased out by Exhibitgroup. (Cordial Aff. ¶ 27; Hellberg Aff. ¶ 36; Tr., Vol. II at pp. 180–82).

37. Instead of using the GDC software as a platform for further software development, Exhibitgroup developed separate technology, employing third-party vendors to write the programs. (Cordial Aff. ¶ 28; Hellberg Aff. ¶ 37).

38. Cordial provided written notice on January 16, 2003 that he expected to leave Exhibitgroup's employ when his Employment Agreement expired on February 22, 2003. (Cordial Aff. ¶ 39). Exhibitgroup did not ask Cordial to reconsider or offer him any position in the company. *Id.* ¶ 40.

39. On or about February 20, 2003, Cordial informed Exhibitgroup management, including its President and CEO Kim Fracalossi ("Fracalossi"), that he was considering forming a new company to develop on-line software applications that would be offered to exhibit houses. *Id.* ¶ 41.

40. At the same meeting, Cordial discussed his plans to conduct a survey to determine whether there was a market for such software and to determine what functions and capabilities were attractive to the market (the "Survey"). *Id.* ¶ 42. The Survey was designed to gauge the viability of entering the software market. *Id.*

41. Also at the same meeting, Cordial invited Exhibitgroup to participate in the Survey. (Stip.¶ 17). Ms. Fracalossi instructed Mr. Cordial to meet the following day with Exhibitgroup's Chief Information Officer, Stephen Barry ("Barry"), to discuss the Survey. (Cordial Aff. ¶ 44). Ms. Fracalossi authorized Mr. Barry to "do the survey and help with the gap analysis." (Tr., Vol. I at p. 70, ll. 23–25, p. 71, l. 1). On February 21, 2003, Mr. Cordial met with Mr. Barry and described his idea for the proposed Survey. (Cordial Aff. ¶ 44). Neither Mr. Barry nor any other Exhibitgroup representative objected to Cordial's proposal; to the contrary, they at least tacitly encouraged him to pursue his plans further by advising him that Exhibitgroup might purchase software from Mr. Cordial's new company. *Id.*

42. Exhibitgroup formally terminated Hellberg's employment by letter dated February 18, 2003 and signed by Ms. Fracalossi. (Ex. H). Mr. Hellberg had asked to continue working for Exhibitgroup, but was advised that his employment was terminated. (Exs. G and H).

43. Upon their departure, Cordial and Hellberg did not remove or retain copies of any Exhibitgroup software and do not have in their possession any codes, program copies, backup tapes or documentation relating to any Exhibitgroup software program. (Cordial Aff. ¶ 36; Hellberg Aff. ¶ 47; Tr., Vol. II at p. 159, ll. 10–20; p. 174, ll. 15–24).

44. During the week following February 22, 2003, Cordial, Hellberg and Pro-

vencher met to formulate the Survey. (Cordial Aff. ¶ 47; Hellberg Aff. ¶ 51).

45. Neither Cordial nor Hellberg had discussions with Provencher about going into business together prior to Provencher's resignation from Exhibitgroup in January 2003. (Provencher Aff. ¶ 6; Cordial Aff. ¶ 48; Hellberg Aff. ¶ 52).

46. In a March 14, 2003 letter to participants in the Survey, including Exhibitgroup, Cordial stated calan was exploring market interest in software that would provide customer collaboration, account management and e-commerce capabilities to purchasers or users. (Cordial Aff. ¶ 50, and Cordial Letter, attached thereto as Exhibit 2; Shockley Aff. ¶¶ 4–10; Gentile Aff. ¶¶ 4–10; Montague Aff. ¶¶ 4–10).

47. Cordial conducted the Survey beginning on March 15, 2003, and contacted approximately 20 exhibit houses, including Exhibitgroup. (Cordial Aff. ¶ 49). Exhibitgroup provided detailed responses to the Survey, identifying (1) the features and capabilities of its software; and (2) the features it would like to see included in a commercially available product. (Ex. K). The results of the Survey were incorporated into a white paper, copies of which were given to each participant, including Exhibitgroup. (Stip.¶ 18).

48. On March 25, 2003, calan communications issued a press release announcing that it was working on the development of software for use by exhibit houses. (Ex. 8). The March 25, 2003 press release quotes Hellberg as follows: "It is no longer necessary for trade show/event suppliers to write expensive, customized code in an attempt to meet the requirements of their customers. Trade show/event suppliers are not in the software development business, but until now they had no choice but to develop their own technology solutions." (Exs. 8 and 11).

49. Calan thereafter hired a third-party to write software based on concepts developed through the Survey and from Defendants' independent review of publicly available information about current technologies. The company hired to write the software for calan was not involved in formulating or writing the GDC software program. (Cordial Aff. ¶ 55; Hellberg Aff. ¶ 53).

50. Calan's product, which is called "e-info," is expected to have applications within the exhibit house industry and in other industries, including building trades and the museum, advertising, marketing and public relations industries. (Cordial Aff. ¶ 57; Cordial Aff. ¶ 55).

51. E-info is neither on the market nor has calan entered into any contracts to sell or lease the software. (Cordial Aff. ¶ 58; Cordial Aff. ¶ 55).

52. Although the software that is being developed by Cordial, Hellberg and calan communications does not compete with Exhibitgroup, either directly or indirectly, one of its purposes is to provide information technology solutions that would enable event industry suppliers to compete with Exhibitgroup. (Ex. 11).

53. The software being developed by Cordial and Hellberg is designed to give Exhibitgroup's competitors, *inter alia*, access to state of the industry technology, enabling them to manage corporate customers' events programs in a collaborative, on-line environment where all of the numerous providers needed for a successful event can share scheduling and budgetary information. (Exs. 8 and 11).

54. The competitive impact of the software that is being developed by calan was described by Cordial in an article that appeared in the July/August 2003 issue of Exhibit Builder magazine as follows:

In the current climate, client demand is for deployment and improvement of e-tool offerings to manage exhibit programs. As a matter of fact, in an independent survey conducted by calan communications, 86% of all exhibit houses interviewed had received such a request by at least one of their customers in the recent past. As more of their clients request technology, exhibit builders are looking for solutions to respond appropriately.

It is clear that e-tools are becoming an expectation on the part of exhibit house customers. For medium sized and even smaller portable display distributors, e-tools can change the competitive landscape because these companies can deliver services once offered only by their larger competitors. Although capabilities to meet client expectations vary by company, recognition of the importance of offering technology applications for program management is almost universal.

(Ex. 10 at p. 3).

55. Cordial further described the competitive landscape as follows:

Why e-tools? There are many reasons.

First of all, if customers are asking for such technology, their demands can be ignored only at the risk of losing competitive advantage. Secondly, an exhibit house will be able to improve customer service and internal communications on a 24/7 basis. Technology is not time-dependent—and as global programs become more and more the norm, access to program elements can be available at all times. And finally, technology is an integral part of daily reality for all of us, no matter what our business segment. As suppliers and strategic partners, exhibit builders cannot afford to look less technologically sophisticated than the client base they serve.

*Id.*

56. Cordial also indicated that technology such as the software calan is developing has made a difference between winning and losing business:

Exhibit houses have reported that e-tool capabilities have made a difference between winning and losing business: 80% of the $20M+ houses and 40% of the 10–20M houses claim to have won business because of e-tools, while 20% of the 20M+ exhibit houses say they have lost business because of lack of the correct electronic capabilities.

*Id.* at 5.

57. Finally, Cordial stated that "e-tools are becoming increasingly state-of-the-art in managing programs, creating a demand for the exhibit builder to provide these services." *Id.* He concluded: "Regardless of the direction a company chooses, the data points to an inevitable conclusion: to survive in a highly competitive environment, exhibit builders are going to not only offer Web-enabled technology but embrace it and link it to internal systems. Customers expect nothing less." *Id.*

58. On June 11, 2003, while e-info was still in its early stages of development, calan performed an on-line demonstration for companies that had participated in the Survey, including Exhibitgroup. (Cordial Aff. ¶ 59). Exhibitgroup representatives, including its Chief Information Officer, Mr. Stephen Barry, viewed the demonstration. (*Id.;* Barry Aff. ¶ 6).

59. The software calan is developing is not currently targeted toward and is not being marketed to customers of Exhibitgroup. (Cordial Aff. ¶ 60; Hellberg Aff. ¶ 56).

60. To the extent the calan software performs functions that overlap with Exhi-

bitgroup programs eg@work, EgXpress or the Exhibitgroup Workflow Software, those "similarities" relate solely to features that are widely available in existing "off-the-shelf" programs that are currently on the market and already available to Exhibitgroup's competitors. (Cordial Aff. ¶ 63).

61. Although Exhibitgroup had been aware since at least March 2003 that Defendants intended to develop software marketed to, *inter alia,* the exhibit design industry, Exhibitgroup did not advise Defendants until on or about August 11, 2003 that it believed they were violating their non-compete covenants. (Cordial Aff. ¶ 64; Hellberg Aff. ¶ 58).

62. Since leaving Exhibitgroup's employ, Cordial and Hellberg have made a substantial personal investment of funds and time in the development of e-info, in reliance on Exhibitgroup's expressions of support and its failure to object to the venture. (Cordial Aff. ¶ 65; Hellberg Aff. ¶ 60). Cordial has invested over $500,000 in calan during the past year. (Tr., Vol. II at p. 74, ll. 20–22).

63. Defendants Cordial and Hellberg acted in good faith vis-à-vis Exhibitgroup during their employment, after their departure from Exhibitgroup, and in conjunction with the formation of calan communications. (Tr., Vol. II at p. 24, ll. 8–21).

64. To her credit, Exhibitgroup President and CEO Kim Fracalossi testified candidly that neither Exhibitgroup nor Viad can demonstrate any lost revenue or the loss of any existing customers as a result of the Defendants' conduct. (Tr., Vol. I at p. 97, ll. 21–24).

65. In its Form 10–Q filed November 13, 2003 for the period ending September 30, 2003, Viad did not disclose any poten-

tial loss as a result of Defendants' conduct. (Ex. M).

66. The restrictive covenants signed by Cordial and Hellberg will expire by their own terms on February 22, 2004. (Stip.¶ 19).

## Discussion

### I. Legal Standards for Injunctive Relief

■ An injunction "is an 'extraordinary remedy, which should be granted only in limited circumstances.' " *Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 800 (3d Cir.1989) (*quoting Frank's GMC Truck Center, Inc. v. General Motors Corp.,* 847 F.2d 100, 102 (3d Cir.1988)). Although Viad's request for injunctive relief is based on a state law cause of action, *viz.,* breach of restrictive covenants ancillary to the sale of a business, federal law governs whether an injunction is appropriate:

> We utilize a federal standard in examining requests to federal courts for preliminary injunctions.... 'Although the right upon which this cause of action is based is state-created, Rule 65(a) of the Federal Rules of Civil Procedure contemplates a federal standard as governing requests addressed to federal courts for preliminary injunctions.'

*Instant Air Freight Co.,* 882 F.2d at 799 (*quoting System Operations, Inc. v. Scientific Games Dev. Corp.,* 555 F.2d 1131, 1141 (3d Cir.1977)).

■ To obtain a preliminary injunction, the moving party must prove four things: (1) likelihood of success on the merits of its claim and (2) irreparable harm if relief is not granted; if these first two threshold showings are made, the Court must then consider, to the extent relevant, (3) whether an injunction would harm the defendant more than denying relief would harm the plaintiff and (4) whether granting relief

would serve the public interest. *A.C.L.U. v. Ashcroft*, 322 F.3d 240, 250 (3d Cir. 2003); *Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir.1994).

### A. Likelihood of Success on the Merits

█ In order to satisfy the exacting standard necessary for the imposition of injunctive relief, Viad must demonstrate a reasonable likelihood of success on the merits. To determine whether Viad is likely to succeed on the merits of its claim for breach of Defendants' Employment Agreements, the Court must first determine whether, under Pennsylvania law, the non-competition covenants at issue are enforceable, and if they are, whether Defendants have breached them. *See, e.g., Westec Security Services, Inc. v. Westinghouse Electric Corp.*, 538 F.Supp. 108, 117 (E.D.Pa.1982).[1]

█ Restrictive covenants are disfavored under Pennsylvania law because they are restraints on trade that "clash . . . . with the common law's policy of encouraging free competition." *Id. (citing Hayes v. Altman*, 438 Pa. 451, 266 A.2d 269, 271 (1970)). As such, they are strictly construed, and must be carefully reviewed to assure that they are reasonable. *Morgan's Home Equipment Corp. v. Martucci*, 390 Pa. 618, 136 A.2d 838, 846 (1957); *see also Westec*, 538 F.Supp. at 121. When non-competition covenants are executed ancillary to the sale of a business, however, they are held to a less "stringent test of reasonableness" than those that are merely ancillary to employment contracts. *Id. (citing Alabama Binder & Chem. v. Pennsylvania Indus. Chem.*, 410 Pa. 214, 189 A.2d 180, 184 (1963)).

█ The determination of whether a restrictive covenant is reasonable, and therefore enforceable, requires the court to consider all the facts and circumstances. *See Insulation Corp. of America*, 446 Pa.Super. 520, 667 A.2d 729, 734 (1995); *Jacobson & Co. v. International Environment Corp.*, 427 Pa. 439, 235 A.2d 612, 619 (1967); *see* Restatement of Contracts, § 18, Comment A. Generally, a restrictive covenant may be enforced if it is ancillary to the sale of a business and if it is necessary to protect the legitimate interests of the purchaser of a business. *Westec*, 538 F.Supp. at 121. Restrictive covenants ancillary to the sale of a business are designed to protect goodwill, in addition to physical assets and investments. *Morgan's Home Equipment*, 136 A.2d at 846.[2] These covenants promote "goodwill [as] a saleable asset 'by protecting the buyer in the enjoyment of that for which he pays.' " *Westec*, 538 F.Supp. at 121 (*quoting* 6A Corbin, The Law of Contracts, §§ 1385, 1387). Frequently, the interference with or the destruction of the goodwill purchased with the physical assets of the business is unascertainable and unquantifiable. *Geisinger Clinic v. Di Cuccio*, 414 Pa.Super. 85, 606 A.2d 509, 518 (1992) (*citing*

1. The Merger Agreement and Employment Agreements contain choice-of-law provisions expressly stating that their enforcement is governed by Pennsylvania substantive law. *See* Exs. B and C, ¶¶ 14, 19. A federal court sitting in diversity is bound by the choice of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Neither party disputes that Pennsylvania law applies here.

2. The Pennsylvania Supreme Court has expressed this rationale thusly:

> General covenants not to compete which are ancillary to the sale of a business serve the asset known as "good will" which the purchaser has bought. Indeed, in many businesses it is the name, reputation for service, reliability, and the trade secrets of the seller rather than the physical assets which constitute the inducements for a sale. Were the seller free to reenter the market, the buyer would be left holding the proverbial empty poke.
>
> *Morgan's Home Equipment*, 136 A.2d at 846.

*John G. Bryant Co., Inc. v. Sling Testing and Repair, Inc.*, 471 Pa. 1, 369 A.2d 1164 (1977)).

■ Thus, to be enforceable under Pennsylvania law, a covenant not to compete must be: (1) ancillary to an employment contract or to a contract for the sale of goodwill or other subject property, (2) supported by adequate consideration, (3) reasonably necessary to protect legitimate interests of the purchaser and (4) reasonably limited in duration and geographic extent. *Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 2003 U.S.App. LEXIS 24856 (3d Cir.2003); *Westec*, 538 F.Supp. at 121; *Piercing Pagoda, Inc. v. Hoffner*, 465 Pa. 500, 351 A.2d 207, 210 (1976); *Volunteer Firemen's Ins. Servs., Inc. v. CIGNA Property and Casualty Ins. Agency*, 693 A.2d 1330, 1337 (1997). The defendant has the burden of proving that the covenant not to compete is unreasonable. *ProtoComm Corp. v. Fluent, Inc.*, 1995 WL 3671, *1, 1995 U.S. Dist. LEXIS 40, *5 (E.D.Pa.1995); *Westec*, 538 F.Supp. at 122; *John G. Bryant Co.*, 369 A.2d at 1169.

### 1. The Non–Competition Covenants Signed By Defendants Are Enforceable

■ Although the restrictive covenants at issue in this case are contained in the Employment Agreements of Cordial and Hellberg, it is clear from the evidence that these covenants were ancillary to the February 22, 2000 acquisition of GDC by Exhibitgroup. As executives and shareholders of GDC, Defendants Cordial and Hellberg exercised considerable influence over the negotiations between GDC and Exhibitgroup. Cordial testified to this influence, stating that various contractual provisions were either introduced by Defendants, or were the result of negotiations involving them. (Tr., Vol. II at p. 22, ll. 2–5, 8–11). Cordial was told by Exhibitgroup executives that the ultimate consummation of the merger was contingent upon his participation in Exhibitgroup, as he had client responsibility for major accounts of GDC, such as AT & T and Ford. (Tr., Vol. II at p. 17, ll. 6–11). Finally, Cordial and Hellberg received $978,099 and $3,672,461, respectively, pursuant to the merger. (Stip.¶ 11). Accordingly, Defendants did not deny that their non-competition covenants were supported by adequate consideration. Nor have Defendants challenged the reasonableness of the temporal or geographic scope of the restrictive covenants.[3]

■ As to whether the restrictions are reasonably necessary for the protection of

---

**3.** Both the temporal and geographic scopes of the restrictive covenant are reasonable. Pennsylvania state and federal courts have routinely upheld one year covenants not to compete. *See, e.g., Diversey Lever, Inc. v. Hammond*, 1997 U.S. Dist. LEXIS 648, at *52, 1997 WL 28711, *1, *23 (E.D.Pa. Jan.24, 1997) (upholding employer's one year covenant not to compete), *aff'd* 116 F.3d 467 (1997); *Admiral Services, 1995 WL 134812* at *6 (upholding employer's two year covenant not to compete); *Worldwide Auditing Services, Inc. v. Richter*, 402 Pa.Super. 584, 587 A.2d 772, 776 (1991) (upholding employer's two year covenant not to compete).

Similarly, the geographic scope of the noncompete clause is reasonable as well. Exhi-

bitgroup markets and sells its products and services to customers throughout the United States and Canada. Accordingly, restricting Cordial and Hellberg's ability to work for or aid Exhibitgroup competitors, or solicit Exhibitgroup customers in North America is reasonable. *See, e.g., QVC, Inc. v. Bozek*, 1996 U.S. Dist. LEXIS 4770, *10, 1996 WL 179993, *1, *4 (E.D.Pa. Apr.12, 1996) (upholding national geographic scope of restrictive covenant); *Kramer v. Robec, Inc.*, 824 F.Supp. 508, 512 (E.D.Pa.1992) (nationwide bar on competition reasonable "because Robec and its competitors market their products in all fifty states"); *Volunteer Firemen's Insurance Services, Inc. v. CIGNA Property and Casualty Insurance Agency,* 693 A.2d 1330 (Pa.Su-

the employer, "Pennsylvania cases have recognized that trade secrets of an employer, customer good will and specialized training and skills acquired from the employer are all legitimate interests protectable through a general restrictive covenant." *Thermo–Guard, Inc. v. Cochran,* 408 Pa.Super. 54, 596 A.2d 188 (1991). Exhibitgroup argues that enforcement of the covenant is necessary for the protection of its competitive advantage in the marketplace, as well as its client accounts and customer relationships. It stresses the testimony of Cordial, who stated that the majority of his time while employed with Exhibitgroup was spent in client development and sales presentations to major accounts. Exhibitgroup maintains that while employed, Cordial developed relationships of trust and confidence with its customers. The evidence supports the proposition that part of Cordial's job was to nurture and develop goodwill with existing and potential customers in order to secure contractual business relationships, and that he excelled in that role. (Tr., Vol. II at p. 17, ll. 5–11). Therefore, to the extent that it seeks to preserve customer relationships and goodwill purchased during the GDC merger, the restrictive covenants in the agreement are reasonably necessary for the protection of Exhibitgroup's legitimate business interests.

### 2. Viad Has Not Carried Its Burden Of Proving That Defendants Breached the Restrictive Covenants

In order to determine whether Defendants' activities constitute a breach of the non-competition covenant, we first look to the contract. *Westec,* 538 F.Supp. at 117. "If the language of the contract is unambiguous and susceptible of only one interpretation, a court will determine the

parties' intentions on the basis of the clear wording of the contract." *Id.* Section 8.1 of the Employment Agreements provides:

> Employee hereby covenants and agrees that for a period of three (3) years following the Closing [of the Merger] and for an additional period of one (1) year thereafter or, if longer, for a period of one (1) year following expiration of the [three-year] Term ... **Employee shall not, within the E/G Business Territory, engage directly or indirectly,** either for himself or for another, or as an employee, partner, consultant, affiliate, or controlling shareholder of any person or entity so engaged, **in any business that owns or operates any activity which competes with the Business or Employer's Business, nor compete, or aid another to compete,** nor solicit or induce any other employee of Employer or GDC to terminate employment with Employer or GDC or compete in any way with the Business or Employer's Business.

(Exs. B and C at § 8.1) (emphasis added).

As discussed above, Exhibitgroup is an exhibit house that provides services to companies participating in trade shows and conventions, including exhibit design, construction, transportation, installation and storage. (Stip.¶ 5). The Employment Agreements defined the term "Employer's Business" as follows: "[Exhibitgroup] designs, builds and installs convention, trade show, museum and other exhibits and displays." (Exs. B and C, Recitals ¶ B).

Calan communications, by contrast, is a software development company. (Stip.¶ 22). There was no evidence introduced at the hearing to demonstrate that Defendants were in any way competing with Exhibitgroup in the "desig[n], build[ing] and install[ation] [of] convention,

per.1997) (upholding nationwide noncompete agreement).

trade show, museum and other exhibits and displays," selling such products or services to current or potential Exhibitgroup customers, or otherwise involved in the management or operations of an exhibit house competitor. The record is also devoid of evidence that Defendants are indirectly competing with Exhibitgroup, whether as intermediaries, agents or brokers to current or potential Exhibitgroup customers. Defendant Cordial testified credibly that calan has no customers, no sales contracts, and no revenue. (Tr., Vol. II at p. 74, ll. 9–15).

Although the Defendants are not competing directly or indirectly with Viad, their activities implicate the non-competition covenants of their Employment Agreements which state that "Employee shall not ... aid another to compete." (Exs. B and C at § 8.1).[4] Recognizing that the covenants involved in this case expressly prohibit Defendants from aiding Exhibitgroup's competitors, the pivotal issue is whether Defendants' efforts to develop software (e-info) that could be sold to exhibit houses, constitutes "aiding" competitors under the Employment Agreements.

It is clear that one of the primary targets of e-info is the exhibit house industry, which includes competitors of Exhibitgroup. By incorporating calan, issuing press releases, conducting market research, issuing a white paper, and conducting a webcast for potential customers, there can be no doubt that Defendants have taken overt acts that have laid the groundwork to, at some time in the future, aid competitors of Exhibitgroup. Despite these preparatory steps, however, Viad adduced no evidence to show that calan has *actually* aided Exhibitgroup's competitors or that such aid is forthcoming prior to the expiration of the restrictive covenants less than two month hence. Defendant calan has no customers, revenue, or even a product on the market. Indeed, it remains unclear when or if e-info will be available for sale. (Tr., Vol. II at p. 78, ll.4–11).

No controlling authority was cited by either party—and this Court has found none—on the issue of "aiding" competitors in violation of a restrictive covenant. However, Plaintiff relies upon *De Long Corp. v. Lucas,* 278 F.2d 804 (2d Cir.1960) for the proposition that preparing to aid competitors constitute a breach of similar "aiding" or "assisting" provisions of restrictive covenants. In *De Long,* the Court of Appeals for the Second Circuit held that a former employee violated the contractual prohibition not to "to assist anyone to compete" in a manner related to his former employment, which consisted of specialized engineering and sales of equipment for marine exploration. *Id.* at 805–6. The former employee was paid a fee of $100,000 by a competitor of his former employer to perform engineering and design work to develop a jack that was essential in securing a government contract to the detriment of his former employer. *Id.* at 809–10.

Unlike the former employee in *De Long*—who provided direct, tangible assis-

---

**4.** Defendants argue that attempts by the Plaintiff to apply the language and scope of the "aiding" provision of the Employment Agreements to the software development activities of Defendants is overbroad and constitutes an unreasonable restraint of trade, rendering the covenant unenforceable. Defendants argue that the application of this provision would prohibit Defendants from engaging in *any* activities which might assist or further the business interests of competitors, including teaching marketing courses to a competitor's employees, opening a travel agency, or selling cellular telephones to competitors. These arguments are factually inapposite and legally irrelevant because Viad has failed to demonstrate breach of the "aiding" provision of the Employment Agreements.

tance to a competitor of his former employer—here the activities of Defendants are most fairly characterized as "preparing to aid" Plaintiff's competitors. Although it is a close question, the Court holds that mere preparations by Defendants to potentially aid competitors of Exhibitgroup do not rise to the level of breach of their restrictive covenants. Accordingly, based on the evidence adduced to date, the Court finds that Viad has not carried its burden of proving likelihood of success on the merits regarding Defendants' breach of the Employment Agreements.

## B. Irreparable Harm

■■■ Even assuming, *arguendo*, that Viad were able to carry its burden of proving likelihood of success on the merits, it cannot demonstrate irreparable injury caused by or resulting from Defendants' actions. A preliminary injunction cannot be granted absent a showing of irreparable harm. *Instant Air Freight Co.*, 882 F.2d at 800; *Frank's GMC Truck Center*, 847 F.2d at 102. In order to prove irreparable harm, the moving party must "demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following trial." *Acierno*, 40 F.3d at 653 (*quoting Instant Air Freight Co.*, 882 F.2d at 801). The moving party must offer a "clear showing of immediate irreparable injury," *ECRI v. McGraw–Hill, Inc.*, 809 F.2d 223, 226 (3d Cir.1987) (district court's preliminary injunction vacated due to plaintiff's failure to show irreparable harm).

Furthermore, the harm created by a failure to issue the requested injunction must "be of a peculiar nature, so that compensation in money cannot atone for it." *Acierno*, 40 F.3d at 653 (citations and internal quotations omitted). The word "irreparable connotes 'that which cannot be repaired, retrieved, put down again,

atoned for.' " *Id.* (citations omitted). Economic loss "does not constitute irreparable harm." *Id.* Additionally, "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Id.* (*quoting Sampson v. Murray*, 415 U.S. 61, 90, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974)).

■■■ In addition, the claimed injury cannot merely be possible, speculative or remote. The proof required for injunctive relief has been characterized as a "clear showing of immediate irreparable injury;" or a "presently existing actual threat; [an injunction] may not be used simply to eliminate a possibility of a remote future injury...." *Acierno*, 40 F.3d at 655 (citations omitted); *see also Continental Group, Inc. v. Amoco Chemicals Corp.*, 614 F.2d 351, 359 (3d Cir.1980) (injunctions not issued to allay fears and apprehensions or to soothe anxieties of parties). More than the mere risk of irreparable harm must be demonstrated. *ECRI*, 809 F.2d at 226. The moving party must demonstrate that the alleged harm is imminent, not merely in the "indefinite future." *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir.1992).

■■■ Although Viad has stated repeatedly that it stands to lose its "competitive advantage" in the exhibit house industry if Defendants are not enjoined from pursuing software development, it has offered no evidence in support of this conclusion. Viad presented no market analyses, expert reports or testimony concerning the exhibit industry or potential losses due to the distribution of software such as e-info to its competitors. Although irreparable harm is by its nature unquantifiable, it is

nevertheless incumbent upon the moving party to make a "clear showing" that the threat of loss, however undefined, is both "immediate" and a "presently existing actual threat." *Acierno,* 40 F.3d at 655. Plaintiff has failed to meet this exacting standard. Indeed, the only testimony impacting the irreparable harm analysis belied Viad's claim. To her credit, Exhibitgroup President and CEO Kim Fracalossi candidly acknowledged that Exhibitgroup had suffered *no lost revenue or sales* due to the actions of Defendants. (Tr., Vol. I at p. 97, ll. 16–24).

Viad argues in its post-trial brief that covenants not to compete are *prima facie* enforceable in equity where a breach in the employment context is present, relying on several Pennsylvania Supreme Court cases, including *Bettinger v. Carl Berke Assoc., Inc., et al.,* 455 Pa. 100, 314 A.2d 296 (1974) and *John G. Bryant Co. v. Sling Testing & Repair, Inc.,* 471 Pa. 1, 369 A.2d 1164, 1167 (1977). Additionally, Viad relies on *Hillard v. Medtronic, Inc.,* 910 F.Supp. 173 (M.D.Pa.1995), for the general proposition that in the context of restrictive employment covenants, the "potential loss of customers" is sufficient to prove irreparable harm.

Two aspects of these cases make them readily distinguishable from the instant case, however. First, although the enforceability of a restrictive employment covenant is governed by Pennsylvania substantive law, federal law governs the standards for injunctive relief, including the irreparable harm requirement. *Instant Air Freight Co.,* 882 F.2d at 799. Viad has cited no case from the Court of Appeals for the Third Circuit—and the Court is unaware of such authority—which holds that breach of a restrictive covenant is *prima facie* evidence of irreparable harm.

Second, the cases cited by Viad are factually distinguishable from this case. In each of the cases Viad cited, the plaintiffs introduced evidence that the defendants had been engaged in direct competition with their former employers, including the active solicitation of existing clients. *See Bettinger v. Carl Berke Assoc., Inc., supra; John G. Bryant Co. v. Sling Testing & Repair, Inc., supra; Hillard v. Medtronic, Inc., supra.* In *Bettinger,* the defendant had established a competing business immediately upon leaving the plaintiff's employ, recruited two of its employees to work with him (who pilfered copies of customer lists), and was actively engaged in the solicitation of existing clients. *Bettinger,* 314 A.2d at 297–99. In *Bryant,* the defendant admitted that he had made direct sales to plaintiff's accounts in violation of his covenant not to compete. *John G. Bryant Co.,* 369 A.2d at 1166. Finally, in *Hillard,* the court found that the defendant was "acting on behalf of a competitor of [his former employer] and pursuing business relationships with customers of [his former employer] that he serviced while employed there." *Hillard,* 910 F.Supp. at 179. In stark contrast to the facts presented in the foregoing cases, here Viad offered no evidence of the actual or imminent loss of customers. Nor could such evidence be offered because calan has no product available for sale, and it has neither solicited Exhibitgroup customers nor made any sales. Absent this essential evidence, the harm to Exhibitgroup, if any at all, is too attenuated to justify the extraordinary relief of an injunction.

Additionally, the Court is unpersuaded that Viad will suffer harm not compensable in monetary damages if the injunction is not granted. If Exhibitgroup loses business as a consequence of Defendants' breaches of their restrictive covenants,

damages can be ascertained by comparing the customer lists of Exhibitgroup with customers who have purchased calan software, and determine whether Defendants' breaches caused the loss of business. *See, e.g., Mettler–Toledo, Inc. v. Acker,* 908 F.Supp. 240, 248 (M.D.Pa.1995) (loss of customers to a rival could be quantified and compensated by money damages).[5]

## IV. Conclusion

Upon their departure from Viad, Defendants Cordial and Hellberg incorporated calan communications in good faith and not in direct or indirect competition with Exhibitgroup. Nevertheless, the marketing and promotion of e-info to competitors of Exhibitgroup comes perilously close to crossing the line between "preparing to aid" and actually "aiding" competitors of Exhibitgroup. Accordingly, although the Court will deny Viad's Motion for Preliminary Injunction for failure to prove likelihood of success on the merits and irreparable harm, it will do so without prejudice to Viad's right to renew the Motion in accordance with the Order of Court entered herewith.

## ORDER OF COURT

AND NOW, this 24th day of December, 2003, in accordance with the foregoing Opinion, it is HEREBY ORDERED that:

Plaintiff Viad's Motion for Preliminary Injunction (document # 10) is DENIED without prejudice to its right to renew the motion should Defendants enter into any agreements, partnerships, ventures, or make any sales to Exhibitgroup customers or competitors prior to the February 22, 2004 expiration of the non-competition period.

---

**5.** As Plaintiff has failed to carry its burden concerning success on the merits or irreparable harm, it is unnecessary to address the balancing of the equities or the public interest. Additionally, Defendants argue that Plaintiff is barred from the relief it seeks by the doctrines of laches and equitable estoppel. Although the Court need not decide these issues given the Plaintiff's inability to prove the requirements for equitable relief, the Court notes that Plaintiff waited a full seven months (in the context of a one-year restrictive covenant) following the departure of Defendants Cordial and Hellberg to first notify them that their actions surrounding the incorporation of calan communications and the development of e-info might be in breach of their restrictive covenants. The instant action was not brought until September 23, 2003, and the Motion for Preliminary Injunction was not filed until October 22, 2003, eight months following the termination of Defendants' employment with Exhibitgroup.

Additionally, Defendant Cordial was candid and forthright to Exhibitgroup and its executives concerning his plans to develop a software product for use in the exhibit house industry. This transparency continued as Exhibitgroup participated in calan's technological survey in March, 2003. During this participation (at the behest of Viad CEO Fracalossi and with the full knowledge of Viad CIO Barry), Exhibitgroup indicated that it would be interested in purchasing and potentially investing in calan's software. In April, 2003, Exhibitgroup received calan's white paper, which again clearly demonstrated its stated mission and target market. In June, 2003, Exhibitgroup participated in the webcast of e-info, which again demonstrated that calan sought to develop a software package with specific application to the exhibit house industry. Only after this webcast did Exhibitgroup act to inform Defendants of a potential violation by letter dated August 11, 2003.